## Klensin, Appellant, v. Board of Governance of the Pennsylvania Bar.

Argued May 2, 1933.   Before FRAZER, C. J., SIMPSON, KEPHART, SCHAFFER, MAXEY, DREW and LINN, JJ.

*Francis Shunk Brown,* with him *Philip V. Mattes* and *Morgan S. Kaufman,* for appellant.

*John Hampton Barnes,* for Board of Governance.

PER CURIAM, September 25, 1933:

Respondent appeals from the recommendation of the Board of Governance that he be disbarred.

The record is a large one, covering 771 printed pages. We have carefully read it all. We have given most thorough consideration also to the ample brief filed in his behalf and to the earnest plea of his able advocate who argued his case at our Bar. After weighing everything which has been urged in appellant's behalf, our judgment is that the recommendation of the hearing masters and the Board of Governance must be given effect. "The Board of Governance had its origin with the Bar of the State and was appointed by us upon its representation that such a body would greatly aid in maintaining proper standards of conduct and practice among its members and enable the profession to discipline itself. Their findings come to us carrying weighty presumptions of justice and propriety": Rosenbaum's Case, 300 Pa. 465, 466.

The complaints against respondent were filed by Ben L. Stone, a member of the Lackawanna County Bar, by Anna Kliklus, a client, and by Stanley Rushen, a witness in cases conducted by respondent. They charged him with (a) Unethical solicitation of negligence cases through the assistance of Abraham Klensin, his father, (b) Obtaining illegal and unethical contracts for compensation from his clients, (c) Subornation of perjury and obtaining false affidavits from witnesses in support of his clients' cases.

The hearing masters who listened to the evidence for seven days made lengthy findings, which in our opinion

there is ample testimony to support. Summarized they are in part as follows: Respondent is twenty-five years old. He was admitted to our Bar September 26, 1928. He is practicing on his own account in Carbondale. On May 25, 1930, Michael Kliklus, Andrew Zagata and Stanley Chizuk, occupants of an automobile, were killed while driving over a grade railroad crossing a few miles from Carbondale. Each decedent left a widow and several children. The widows were uneducated and without means. Within a few days after the accident respondent's father, who had a desk in the son's office, visited the widow Anna Kliklus at her home in Carbondale and solicited her case for the respondent. Shortly thereafter she came to his office and gave him her case on a contingent basis, signing a written contract for compensation, which provided that respondent and any other attorney whom he might select should receive one-half of the amount recovered whether by settlement or verdict and that the attorneys should pay the cost of the suit. The writing provided that for better securing the agreement the widow set over and transferred to respondent her entire claim and any verdict or judgment entered thereon. Sometime after the accident Abraham Klensin visited Mary Zagata, another of the widows, at her home and solicited her case for the respondent. By reason of such solicitation she came to the latter's office and executed a similar contract for compensation, except that respondent was to advance instead of pay the costs. Abraham Klensin also solicited the third widow, Leona Chizuk, at her home. As a result of such solicitation, she retained respondent, entering into a similar compensation agreement in which it was stipulated that if she received no more than $1,200 in damages respondent was to get nothing.

Respondent did not bring the three actions in this State, but in the City of New York, retaining as his associate a member of the Bar of that city, who under the arrangement between them was to receive one-third of

the fees. When the cases were about ready for trial, respondent took the three widows to New York City and the cases were settled for $10,000 each. Respondent received $15,000, paying thereout $5,000 to his colleague and all costs and expenses. Each widow was given $5,000.

Stanley Rushen, who is one of the complainants, was near the scene of the accident, but was not an eyewitness. Within three or four days thereafter he was visited by Abraham Klensin, who subsequently took him to the respondent on June 16, 1930. Respondent prepared an affidavit which was signed and sworn to by Rushen in which it was set forth that he was traveling in an automobile with another toward the scene of the accident at the time it occurred, that he (Rushen) alighted from the automobile and a car passed and came to a stop a short distance from the railroad crossing, that he saw some one alight from the car, walk over to the crossing, and then come back and reënter the automobile, which proceeded toward the railroad and was struck on the first track by the engine running at a high rate of speed, which had given no warning of its approach by whistle or bell; that the crossing signals were not operating at the time of the accident.

The hearing masters found that this affidavit was false and that the parts of it as to the automobile stopping, an occupant thereof alighting, walking to the crossing, returning and entering the car and no warning of the engine's approach being given, its speed, and that the crossing signals were not operating were fabricated by the respondent for the purpose of making out a case against the railroad company with knowledge that it was false as far as Rushen was concerned. Rushen gave a number of statements both to representatives of the railroad company and to respondent. They were all false in part.

The hearing masters recite in their findings that after suits were brought the attorney for the railroad company fixed a time for the taking of depositions of Rushen and

other witnesses in Scranton. Respondent hearing of this had his father go the night before to Rushen's home and arrange for respondent's meeting him prior to the hearing. They met and Rushen told respondent that he was afraid to go upon the stand and swear falsely that he saw the automobile stop, etc. Respondent told him he would have to so testify as he had already signed and sworn to the statement. At the hearing Rushen did so testify. The hearing masters found that this was perjured testimony, suborned by respondent.

The hearing masters further reported that after the cases were settled Rushen claimed he was entitled to $42 wages which he had lost because of the cases. This sum he demanded of respondent, who refused to pay him. He then complained to Walter Hill, Esq., President of the Lackawanna County Bar Association and later to the Board of Governance. The day after the complaint was sworn to Abraham Klensin took Rushen to respondent's office and he was there paid the $42 in cash. He swore to another affidavit prepared by respondent to the effect that everything he had sworn to in the prior affidavit and at the hearing was true and that the only reason he complained to Mr. Hill was to get the $42. He signed a receipt for the money, also prepared by respondent, in which he stated that the last mentioned affidavit was not made as an inducement to receiving the $42, that it was immaterial to him at the time he made the affidavit whether he would receive the money or not. He also agreed with respondent to withdraw his complaint to the Board of Governance and later wrote a letter to the chairman of the hearing masters asking that the complaint be discharged.

The conclusion of the hearing masters was that Rushen was thoroughly unreliable, but that at the hearing before them when confronted with his false statements, he told the truth, which was that he had not seen the accident at all.

There were other cases which the hearing masters investigated. One of them the Ernest Weivel Case. He was injured October 25, 1930, in an automobile accident and taken to the Carbondale Hospital. The next day Abraham Klensin went to the home of Weivel's wife, told her that he had read of the accident and solicited the case for his son. A few days later Abraham took the wife to the respondent's office. They all went to the hospital, the father included. A similar contract for compensation was signed, except that the respondent was not to pay the costs. The case was eventually settled for $3,650 and respondent obtained one-third, but not paying the expenses, which were considerable.

A child of Mary Cliff was killed by a train. Sometime later Abraham Klensin came to the mother's home and solicited the case for his son, telling her that respondent already had three cases against the same railroad. She and her husband went to Carbondale, were met by Abraham Klensin and taken to the hospital. A similar contract to those mentioned was signed. Suit was brought in New York. The case was eventually settled for $3,000, respondent receiving $1,500.

A son of John Suchiniak was injured on a railroad crossing. Sometime thereafter Abraham Klensin went to the father, solicited the case for his son and told him that the son had four other cases against the railroad. Abraham later came up, brought the father to respondent's office, where the usual contract was signed. The case was settled for $2,000, the respondent receiving $1,000.

A daughter of Anna Letonia was injured in an automobile accident. The mother never knew the Klensins. Abraham went to see her, solicited the case for his son and then took her to see the respondent. A similar contract was signed, excepting that the mother was to pay the costs. The case was settled for $450 and respondent received $175.

Walter Petutsky lost an arm in an automobile accident. One Andrew Lescinski was a friend of Petutsky's and worked with him. Sometime after the accident Abraham Klensin went to Lescinski, whom he knew and took him to the hospital. There Lescinski, at the suggestion of Abraham Klensin, solicited the case for respondent. Petutsky was in no condition to discuss the matter at that time. A week later a brother of respondent saw Lescinski and arranged that he should go later to the hospital and solicit Petutsky again. If such solicitation was successful, Lescinski was to call respondent on the telephone and he would go to the hospital. Lescinski did as directed and Petutsky telephoned. Respondent went to the hospital and later a similar contract was signed at the office. The case was settled for $7,400 and respondent received $2,700.

In the opinion of the hearing masters the father solicited all of these cases. In their report they say that fifteen witnesses testified that Abraham Klensin solicited cases for his son. The father denied that he ever solicited any case. The respondent swore that he had no knowledge that his father ever solicited a case for him. The hearing masters' finding is that the testimony of both father and son was false.

The hearing masters say: "The first charge of unethical soliciation of business is amply sustained by the evidence. It is true that respondent did not employ 'runners' at a compensation. The work of solicitation was confined to his father, who may not have received any cash consideration for the work. Large sums of money were paid by respondent to his father during the latter's activities as a business getter, as shown by respondent's books, but there is nothing to contradict his testimony that such payments were made from natural love and affection. The activities of Abraham Klensin were not confined to praise of his son's legal ability and recommendation of his services to his friends, as suggested by counsel for respondent. He was out to get business and

he got it, and he was not particular as to how, when or where he obtained it. When he read of an accident in the newspapers, he immediately visited the injured party or the relatives and eventually led them to respondent. In some cases he actually brought the parties in his own automobile to respondent's office. ...... That respondent did not know what his father was doing is impossible to believe. It happened too often. Respondent could not have seen one after another of these parties, whom he never saw before, brought to his office by his father without realizing how they got there. ...... The father denies under oath that he ever solicited one of them, deliberately commits perjury in order to save his son, and the respondent not only permits his own father to perjure himself in his behalf, but then denies that he knew anything about it. He commits perjury himself before the hearing masters. ...... The third and most serious charge is subornation of the perjured testimony of the witness Rushen. This is also amply sustained by the testimony. There is no question but that Rushen's affidavit of June 16, 1930, was false and that his subsequent testimony at the hearing to the same effect was perjured. The only issue is as to the subornation by respondent. It is argued that Rushen has made so many false statements that he is really an unmitigated liar and unworthy of belief. This is true to a certain extent. But even such a man may tell the truth when confronted with all of his conflicting statements. And it is also no doubt true that it is easier to suborn a lying witness than a truthful one. However, if the subornation was dependent on the unsupported testimony of Rushen, we might hesitate to accept it. The truth of the matter is that the perjured testimony is of such character that it could not have been invented by Rushen. It required at least the aid and assistance of respondent. Rushen might have conceived the necessity of having the automobile stop, but to have a man get out, walk to the track and back again to the automobile, to have all conceivable

warning signals specifically mentioned and not sounded or out of order is too much for Rushen's brain to have invented. And these were highly important if not vital elements in respondent's case. The unquestioned fact is that respondent needed this testimony to make out a case and supplied it to the witness, Rushen. He may have been willing to swear to it at that time, knowing it was false, but this does not help the respondent. The slightest examination of Rushen by respondent must have shown to him that Rushen never saw the accident at all. This conduct on the part of the respondent requires no discussion. Where a lawyer deliberately suborns perjured testimony in order to obtain a false verdict, it is inconceivable that he could be permitted to hold himself out to the public any longer as fit and worthy to serve them. Another fact is to be noted. On March 3, 1932, respondent prepared another affidavit for Rushen. At that time everyone knew Rushen was a liar. The complaint in this case had been sworn to, setting forth all the facts we now know. In spite of that, respondent had Rushen swear to the same false statements he made on June 16, 1930. The whole performance in respondent's office on March 3, 1932, was not at all to his credit. He paid Rushen $42, which he admittedly owed him and should have paid him before, to get him to withdraw the complaint. Rushen had been after this money for a long time and that is what really started this whole matter of the complaints. The day after the complaint is sworn to, respondent gets Rushen in his office, pays him the $42 and gets a retraction or denial of the complaint in an affidavit. In the release respondent prepared, Rushen states that the $42 was immaterial and had nothing to do with his retraction. In the affidavit prepared at the same time by respondent, Rushen states that to get the $42 was the only reason he ever filed the complaint. To ask us to believe that the payment of the $42 was not conditional on a change of heart by Rushen is sheer nonsense."

Respondent attacks the report of the hearing masters on several grounds, among others, that they denied him an impartial trial on specific charges, under the principles and practice in equity, and substituted a general investigation, directed to uncovering any possible ethical mistakes in his career, with all presumptions against him. There is no absolute requirement that the proceedings before the hearing masters shall be conducted as in equity. They are to conform as near as may be to the principles and practice in equity cases. The charges made against respondent were sufficiently specific to enable him to know what he had to meet and ample opportunity was afforded him to do so. The hearing masters were justified in investigating the general professional conduct of respondent. Respondent's difficulty was that he could not convince the masters of the propriety of his conduct or the integrity of his defense. The members of the Board of Governance are masters appointed by us, with all the powers and attributes of such officers in the discharge of the duties which devolve upon them.

It is strongly urged upon us that the hearing masters before whom Rushen testified, while recognizing that he was untruthful, reached the conclusion that before them he spoke the truth when he said that he did not witness the accident, and that this finding should not be approved. The weight and reliability of his testimony before them was for the hearing masters. The inference which they drew that respondent had fabricated the story set forth in the Rushen affidavit and told by him subsequently in his testimony, with all its details of his witnessing the accident, would seem to be the only inference possible if they credited his statement before them, as they did, that he had not seen the accident at all.

We think no other conclusion could be reached but that Abraham Klensin had solicited cases for respondent and that the latter knew he had done so. While it is argued that the evidence of solicitation is based on hear-

say testimony, the hearing masters say they disregarded the hearsay and based their findings on direct competent proof. As to this phase of the case the masters report that both father and son committed perjury before them.

It is contended that the Board of Governance approved the findings of the hearing masters without having before them the pleadings, transcript of testimony and respondent's requests for findings and without giving respondent a hearing before them and this amounted to a denial to him of due process of law. Respondent has misapprehended the functions of the Board. Its function is to determine, assuming the findings of the hearing masters to be correct, whether the recommendations of the masters to us are warranted. The judicial review is at our hands, not by the Board.

We think there was no evidence submitted which would have warranted the conclusion by the hearing masters that there was a conspiracy to disbar respondent by purchased testimony.

It is true the charges against respondent were brought by Rushen and by Ben L. Stone, whose disbarment we are decreeing in another proceeding brought by the respondent in this case against him, and that their motives and conduct are unsavory, but what they testified to and brought to light from others and from the respondent himself show that he is not the character of man who should practice law.

The recommendation of the hearing masters and of the Board of Governance is approved, the respondent is disbarred and it is ordered that his name be stricken from the roll of attorneys. The respondent shall pay the costs.