382 A.2d 1226

**ADLER, BARISH, DANIELS, LEVIN & CRESKOFF, A Partnership, Plaintiff/Appellee,**

v.

**Alan B. EPSTEIN, Richard A. Weisbord, Arnold J. Wolf and Sanford I. Jablon, Defendants/Appellants.**

Superior Court of Pennsylvania.

Argued June 21, 1977.

Decided Dec. 28, 1977.

554

Alan M. Lerner, Philadelphia, for defendants/appellants.

Patrick T. Ryan, Philadelphia, for plaintiff/appellee.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT, and SPAETH, JJ.

HOFFMAN, Judge:

The instant case raises an issue important to the entire legal community. Appellants, salaried associates in appellee firm, notified approximately 400 of appellee's clients on whose cases appellants had worked that appellants were forming a partnership and that the clients were free to terminate their relationship with appellee and to be represented by appellants. Appellants contend that the lower court erred when it enjoined them from ". . . contacting and/or communicating with those persons who up to and including April 1, 1977, had active legal matters pending with and were represented by [appellee]." We agree and would dissolve the injunction entered by the court.

Prior to February 27, 1976, the partners of appellee firm were partners in the law firm of Freedman, Borowsky and Lorry, ("Freedman, Borowsky," herein) in Philadelphia. Appellants were salaried associates in the same firm. At that time, all of the attorneys involved in this action withdrew from Freedman, Borowsky and commenced practicing law under the name of Adler, Barish, Daniels, Levin & Creskoff. (Appellee to this action; "Adler, Barish," herein). Appellants continued as salaried associates in the new firm. The

departing partners transferred 1300 case files from Freedman, Borowsky to Adler, Barish.[1]

During the first year of the new partnership, the partners of appellee opened in excess of 600 new files. The partners assigned appellants to various cases primarily as litigation attorneys. Dissatisfied as associates with Adler, Barish, appellants began developing plans for their own partnership during the fall of 1976.

Prior to severing employment with Adler, Barish, appellants rented office space and obtained a line of credit with First Pennsylvania Bank. In their application for credit, appellants enumerated as prospective clients numerous clients of Adler, Barish on whose cases appellants were working. After announcing their intention to resign their positions, but before leaving appellee firm, appellants began contacting approximately 400 of appellee's clients. The correspondence included an explanation that appellants were terminating employment with Adler, Barish and a form letter addressed to Adler, Barish, to be signed by the client, discharging Adler, Barish as the client's attorney.[2]

On April 4, 1977, the lower court granted appellee's application for a restraining order against appellants to prevent further contacts with appellee's clients and a rule to show cause why a preliminary injunction should not be issued. On April 11, the court commenced a hearing on appellee's request for a preliminary injunction. Subsequently, appellants asked that the matter be treated as a final hearing. On May 5, within 24 hours of the close of testimony,[3] the lower court entered the following final decree:

1.  Partners of appellee had a combined interest of 44% in the profits of Freedman, Borowsky. That same percentage was preserved by written agreement between appellee and Freedman, Borowsky.

2.  At about the same time, appellee was sending the same clients a letter instructing each client that his or her case was being transferred to a different associate because the named appellant was no longer with the firm.

3.  See Rule 1531(f)(1), Pa.R.C.P.

"AND NOW, to wit, this 5th day of May, 1977, it is hereby—ORDERED and DECREED—that the defendants, ALAN B. EPSTEIN, RICHARD A. WEISBROD, ARNOLD J. WOLF and SANFORD I. JABLON, and all persons acting in concert with them or otherwise participating with them or acting in their aid or behalf, are permanently enjoined and restrained from contacting and/or communicating with those persons who up to and including April 1, 1977, had active legal matters pending with and were represented by the law firm of ADLER, BARISH, DANIELS, LEVIN and CRESKOFF, except that:

"1. Nothing in this Final Decree shall be construed to preclude the defendants from announcing the formation of their new professional relationship in accordance with the requirements of DR 2–102 of the Code of Professional Responsibility.

"2. Nothing in this Final Decree shall preclude those persons who, up to and including April 1, 1977, had active legal matters pending with and had been represented by the law firm of ADLER, BARISH, DANIELS, LEVIN and CRESKOFF from voluntarily discharging their present attorney and selecting any of the defendants, or any other attorney, to represent them.

"It is further ORDERED and DECREED that the bonds now entered and to be entered shall be dissolved thirty-one (31) days from the date of this Final Decree unless an appeal has been taken." [4]

The lower court based the decree on its conclusion that appellants' activity amounted to a tortious interference with appellee's business relations. See Restatement of Torts, § 766. The lower court also concluded that appellants' correspondence constituted solicitation in contravention of Canon 2 of the Code of Professional Responsibility. Therefore, neither § 767 of the Restatement of Torts nor the First Amendment to the United States Constitution conferred a

4. As to the appropriateness of injunctive relief, see Comment n, § 766 of the Restatement of Torts, and §§ 933–51 of the Restatement of Torts.

privilege covering appellants' correspondence. This appeal immediately followed the entry of the lower court's order.

Appellants contend that the lower court erred when it determined that their activities constituted a tortious interference with appellee's business relations as defined by § 766 of the Restatement of Torts. Moreover, appellants assert that their actions did not constitute solicitation within the meaning of the Code of Professional Responsibility. Further, they claim that the First Amendment and a privilege recognized by § 767 of the Restatement of Torts sheltered their acts from injunctive relief. We hold that appellants enjoyed a privilege pursuant to §§ 766 and 767 of the Restatement of Torts to send their correspondence to appellee's clients.[5]

Section 766 of the Restatement of Torts provides as follows:

"Except as stated in Section 698, one who, without a privilege to do so, induces or otherwise purposely causes a third person not to

(a) perform a contract with another, or

(b) enter into or continue a business relation with another is liable to the other for the harm caused thereby."[6] Our Supreme Court has interpreted § 766 as follows: "At least since *Lumley v. Gye*, (1853), 2 Ell. & Bl. 216, 1 Eng.Rul.Cas. 706, the common law has recognized an action in tort for an intentional, unprivileged interference with contractual relations. It is generally acknowledged that one has the right to pursue his business relations or employment free from interference on the part of other persons *except where such interference is justified or constitutes an exercise of an*

5. Because of this conclusion, we do not determine whether the First Amendment also conferred a privilege upon appellants to communicate with appellee's clients.

6. Section 698 of the Restatement deals with marriage contracts. There is no question that the client-attorney relationship comes within the ambit of § 766, whether the fee arrangement is contingent or otherwise. See *Richette v. Pennsylvania Railroad,* 410 Pa. 6, 187 A.2d 910 (1963).

*absolute right:* Restatement, Torts, § 766." *Birl v. Philadelphia Elec. Co.,* 402 Pa. 297, 300, 167 A.2d 472, 474 (1960). (Emphasis added). See also, *Capecci v. Liberty Corp.,* 406 Pa. 197, 176 A.2d 664 (1962); *Klauder v. Cregar,* 327 Pa. 1, 192 A. 667 (1937).

Even assuming that appellants herein acted "for the purpose of causing [a] specific type of harm," and that absent injunctive relief, "the harm [would] actually result." *Birl v. Philadelphia Elec. Co.,* supra 402 Pa. at 301, 167 A.2d at 472, a plaintiff must also prove that the alleged tortfeasor is not privileged when he acts contrary to the plaintiff's business interests. *Capecci v. Liberty Corp.,* supra. *Bahleda v. Hankison Corp.,* 228 Pa.Super. 153, 323 A.2d 121 (1974). The comment to § 766 makes clear that the issue of "privilege" requires us to balance competing interests: ". . . the importance of the means of inducement relates primarily to the issue of privilege. The predatory means in the early cases, intimidation and fraud, were tortious toward the plaintiff because they were calculated to, and did, affect the conduct of third persons to the plaintiff's damage. But other means may be equally calculated and effective to produce that result; and primarily the plaintiff is concerned with that result rather than with the means by which the third persons were caused to act. The plaintiff's interest in his commercial expectancies must be weighed, however, against the defendant's interest in freedom of action. Where the defendant's conduct is predatory the scale on his side may weigh very lightly, but where his conduct is not predatory it may weigh heavily. The issue is whether in the given circumstances his interest and the social interest in allowing the freedom claimed by him are sufficient to outweigh the harm that his conduct is designed to produce. In deciding this issue, the nature of his conduct is an important factor (see § 767)." Comment (b) at p. 53. See also, *Richette v. Pennsylvania Railroad,* 410 Pa. 6, 187 A.2d 910 (1963).

The lower court concluded that appellants' activity was not privileged by § 767 of the Restatement of Torts

because their communications constituted solicitation in violation of Canon 2 of the Code of Professional Responsibility.[7] Initially, we have serious difficulty accepting the lower court's conclusion that appellants' conduct amounted to solicitation in a legal sense.[8] Solicitation by attorneys or others in their employ has been condemned as a form of barratry. See 9 C.J.S. Barratry § 2(a). At common law, barratry did "not consist in promoting either private suits or public prosecutions when the sole object is the attainment of public justice or private right, but in the prostitution of these remedies to mean and selfish purposes; and, under some statutes, there must be 'a corrupt or malicious intent to vex and annoy.' Inducing others to commence just suits is barratrous if done with a ruinous or oppressive motive." 9 C.J.S. Barratry § 2(a) (citations omitted). The essence of criminal barratry is the bringing of "unjust and vexatious

---

7. More specifically, the lower court found that appellants contravened Ethical Consideration 2–3 and Disciplinary Rule 2–104:

"EC 2–3 Whether a lawyer acts properly in volunteering advice to a layman to seek legal services depends upon the circumstances. The giving of advice that one should take legal action could well be in fulfillment of the duty of the legal profession to assist laymen in recognizing legal problems. The advice is proper only if motivated by a desire to protect one who does not recognize that he may have legal problems or who is ignorant of his legal rights or obligations. Hence, the advice is improper if motivated by a desire to obtain personal benefit, secure personal publicity, or cause litigation to be brought merely to harass or injure another. Obviously, a lawyer should not contact a non-client, directly or indirectly, for the purpose of being retained to represent him for compensation."

"DR 2–104 Suggestion of Need of Legal Services.

(A) A lawyer who has given unsolicited advice to a layman that he should obtain counsel or take legal action shall not accept employment resulting from that advice."

Appellee argues in its brief that the conduct was proscribed by DR 2–103: "A lawyer shall not recommend employment . . . of himself, his partner, or associate to a non-lawyer who has not sought his advice regarding employment of a lawyer." We believe that the same analysis applies to DR 2–103 as applies to DR 2–104.

8. The lower court concluded that appellants' letter constituted solicitation in violation of the Code of Professional Responsibility. In reviewing the lower court's conclusion of law, we must look to the specific meaning of solicitation under the Code of Professional Responsibility and relevant case law, instead of a dictionary definition of solicitation.

suits." The Crimes Code, Act of December 6, 1972, P.L. 1482, No. 334, § 1; 18 Pa.C.S. § 5109. As noted by our Supreme Court, the Code of Professional Responsibility seeks ". . . to eliminate the active recruitment of clients and stirring up of litigation by or on behalf of attorneys." *In re Berlant,* 458 Pa. 439, 443, 328 A.2d 471, 474 (1974). *See also In re Shigon,* 462 Pa. 1, 329 A.2d 235 (1974); *In re Salus,* 321 Pa. 103, 184 A. 69 (1936); *In re Disbarment Proceedings,* 321 Pa. 81, 184 A. 59 (1936); *Klensin v. Board of Governance of the Pa. Bar,* 312 Pa. 564, 168 A. 474 (1933). The common thread in cases involving the issue of solicitation is fomenting litigation or other legal action when none was contemplated by the client. The instant case is readily distinguishable. Appellants contacted only clients who had already sought legal services. They did not attempt to create lawsuits or controversy or to encourage an additional amount of legal work on behalf of those clients whom they contacted.

The lower court erred for a second reason. Even if appellants' conduct did amount to solicitation, the instant proceeding is not a disciplinary one in which that conclusion would be dispositive.[9] A finding of "solicitation" does not foreclose the possibility that the conduct is nonetheless privileged.[10] Rather than conclude that "solicitation" is *per se* unprivileged, we must determine whether appellants' activity was permissible by reference to § 767 of the Restatement.

Section 767 provides as follows:

"In determining whether there is a privilege to act in the manner stated in § 766, the following are important factors:

**9.** Appellants argue that the lower court did not even have jurisdiction to hear a claim involving an alleged violation of the Code, because the disciplinary board has exclusive jurisdiction. We do not reach that issue. *But see In re Shigon,* supra.

**10.** As noted by the Supreme Court in a similar context, "[w]e meet at the outset the contention that 'solicitation' is wholly outside the area of freedoms protected by the First Amendment. To this contention there are two answers. The first is that a State cannot foreclose the exercise of constitutional rights by mere labels. The second is that abstract discussion is not the only species of communication which the Constitution protects . . . ." *NAACP v. Button,* 371 U.S. 415, 429, 83 S.Ct. 328, 336, 9 L.Ed.2d 405 (1963).

"(a) the nature of the actor's conduct,

"(b) the nature of the expectancy with which his conduct interferes,

"(c) the relations between the parties,

"(d) the interest sought to be advanced by the actor and

"(e) the social interests in protecting the expectancy on the one hand and the actor's freedom of action on the other hand."

We will discuss each subsection of 767 seriatim.

(a) Although the lower court found that appellants' conduct was solicitation, we believe that term of opprobrium does not apply in the instant case. First, the communication was not false, misleading, or coercive. Cf. *Richette v. Pennsylvania Railroad,* supra. Our profession may have once viewed communication by a lawyer of certain kinds of information as unseemly. The United States Supreme Court has recently held that the traditional blanket suppression of lawyer advertising violates the First Amendment and prevents the free flow of useful information to consumers of legal services. *Bates v. State Bar of Arizona,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977). *Bates* is not dispositive because it dealt specifically with advertising and with a direct disciplinary proceeding. While appellants' conduct was technically not advertising, *Bates* does indicate that a tension exists between traditional ethical considerations and the First Amendment guarantee of free flow of information, commercial or otherwise. Thus, an analysis of the nature of the actor's conduct does not answer the question of whether appellants' conduct was privileged.

(b) The appellants' action interfered with the expectation of the members of appellee that they would receive whatever fee would be owing as a result of the representation of their clients. As noted by the Pennsylvania Supreme Court (per Justice MUSMANNO) in *Richette v. Pennsylvania Railroad,* supra 410 Pa. at 9, 187 A.2d at 912: "A claimant or patient may, of course, disengage himself from a professional relationship provided he has met all obligations owing to his legal or medical counsellor, but if that disassociation is

the result of coercion or misrepresentation practiced by others, the intervenors are answerable in law as anyone else would be liable for causing the rupture of a binding contract." Obviously, appellee is entitled to payment of any fees already earned, either pursuant to contract or in quantum meruit.[11] The issue is not a factual one—that is, it is not a question of what the partners of appellee actually expected; it is a question of what the law deems reasonable. Because the law permits a client to seek and re-seek counsel of his choice, any expectation that a client would remain constant throughout the course of litigation is unrealistic.

(c) Appellee asserts that ". . . the basic impropriety of the solicitation of clients is compounded by the fact that the defendants acquired their knowledge of the cases of these clients from confidential information, supplied to them in the course of their employment. An associate attorney seems the prototype of a confidential employee, . . ." Appellee's argument is wide of the mark. Even the lower court's order allows the appellants to announce "the formation of their new professional relationship in accordance with the requirements of DR 2–102 . . . ." The only confidential information which appellants attempted to use was the names of the various clients; they certainly did not attempt to breach the attorney-client privilege by revealing to other parties information about ongoing cases. Further, appellee did not attempt to protect the interest now asserted by contractual agreement with appellants.

(d) Obviously, in part, appellants seek to advance their own financial well-being. However, appellants' communications may also advance the interests of appellee's clients. Many of the clients have dealt personally both with partners in Adler, Barish and the associate to whom the case was assigned. In some instances, the associate may have developed the client's trust and faith in his professional competence, despite the fact that the partner may have procured

11. Partners of appellee who had just severed ties with Freedman, Borowsky cannot seriously claim that an expectation grounded on the stability of the firm structure is entirely realistic.

the client's business. Having one's file transferred to a new associate, as proposed in appellee's letter to its clients, will undoubtedly engender additional cost and time to the client. That may well be contrary to the client's best interest. *See* Code of Professional Responsibility, EC 7–8 (requiring a lawyer to ". . . exert his best efforts to insure that decisions of his client are made only after the client has been informed of relevant considerations. . . .") and EC 7–9 (requiring counsel to ". . . act in a manner consistent with the best interests of his client.") Transfer may also necessitate delays in scheduling court appointments. *See* Code of Professional Responsibility, EC 7–19 et seq. on an attorney's duty to the court system in general. The breadth of the lower court's order prevents meaningful contact between appellants and those clients who have a significant interest in expeditious handling of their case by the attorney of their choice.

(e) If the foregoing analysis is correct, the social interest in protecting appellee's expectation is not insurmountable. We must also consider "the social interests in protecting . . . the actor's freedom of action. . . ." We have already noted that allowing appellants to contact appellee's clients may further significant interests of the clients. That policy is closely analogous to the Supreme Court's reasoning in *Bates*:

" . . . a consideration of competing interests reinforced our view that such speech should not be withdrawn from protection merely because it proposed a mundane commercial transaction. Even though the speaker's interest is largely economic, the Court has protected such speech in certain contexts. See, e. g., *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969); *Thornhill v. Alabama*, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940). The listener's interest is substantial: the consumer's concern for the free flow of commercial speech often may be far keener than his concern for urgent political dialogue. Moreover, significant societal interests are served by such speech. Advertising, though entirely commercial, may often carry

information of import to significant issues of the day. See *Bigelow v. Virginia*, supra. And commercial speech serves to inform the public of the availability, nature, and prices of products and services, and thus performs an indispensable role in the allocation of resources in a free enterprise system. See *FTC v. Procter & Gamble Co.*, 386 U.S. 568, 603–604, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967) (Harlan, J., concurring). In short, such speech serves individual and societal interests in assuring informed and reliable decision-making. [*Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council*] 425 U.S. [748] at 761–765 [96 S.Ct. 1817, 48 L.Ed.2d 346]." (433 U.S. at 363–364, 97 S.Ct. at 2699).

Moreover, in balancing the social interests in protecting appellee's expectancy of uninterrupted business relations and appellants' freedom of action pursuant to § 767(e), it is appropriate to note that the lower court could have adequately protected appellee's legitimate expectations by employing a narrower remedy than blanket suppression.[12] For example, the lower court could have protected appellee's legitimate business interests by enjoining overreaching practices. *Bates v. State Bar of Arizona*, supra, predatory business practices, Comment to § 766, or false or misleading statements about the quality of the services to be provided. *Virginia Pharmacy Bd. v. Virginia Consumer Council*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976).

Balancing the competing interests delineated by § 767 of the Restatement of Torts, we believe that the value of free interchange of commercial information endorsed in *Bates*

12. With one insignificant exception, the lower court enjoined all contact with appellee's clients. The court's order allowed appellants to announce the formation of their new professional relationship in accordance with the requirements of DR 2-102(2) of the Code of Professional Responsibility. However, DR 2-102(2) limits the mailing of announcement cards to lawyers, clients, former clients, personal friends, and relatives. The lower court made a specific finding that the persons contacted by appellants were clients of appellee firm rather than the individual appellants. Accordingly, DR 2-102(2) would not permit appellants to send announcement cards to the persons they sought to contact. Therefore, the one exception is meaningless.

and asserted by appellants must prevail. Accordingly, we hold that appellants' conduct was privileged under §§ 766 and 767 of the Restatement of Torts. We dissolve the injunction and dismiss appellee's complaint in equity.

Injunction dissolved and complaint in equity dismissed.

SPAETH, J., files a concurring opinion.

WATKINS, President Judge, and PRICE and VAN der VOORT, JJ., dissent.

SPAETH, Judge, concurring:

This is an equity case. On May 5, 1977, the lower court enjoined appellants "from contacting and/or communicating with those persons who up to and including April 1, 1977, had active legal matters pending with and were represented by [appellees'] law firm. . . . " The court qualified this order by noting that it was not to be construed "to preclude [appellants] from announcing the formation of their new professional relationship," or "to preclude those persons [who had been represented by appellees' firm] from voluntarily discharging their present attorney and soliciting any of [appellants] . . . ."

The basis for this order appears from the lower court's opinion, which may be summarized as follows. Appellants were "merely employees" of appellees' firm. Opinion of lower court at 12. The persons on whose cases appellants were working were therefore not appellants' clients but the firm's. *Id.* at 9, 11. Appellants therefore had no right to write those clients that appellants were forming their own firm, and that the clients had the right to choose to be represented by appellants, or by appellees or any other attorney. Appellants' letter to this effect represented "illegal solicitation in complete violation of and total disregard for the Code of Professional Responsibility." *Id.* at 9. Accordingly, the letters were a "tortious [] interfer[ence] with the contractual and business relations that exist between [appellee's firm] and its clients." *Id.* at 10.

It is noble and daring to embark on a career of law by cutting the umbilical cord that ties one to an employment contract. But taking the heart and soul of the benefactor is immoral, illegal and repulsive. If they want their own firm, let them get their own clients. *Id.* at 11.

Judge HOFFMAN's opinion suggests two, alternative, reasons in support of his conclusion that the order of the lower court must be vacated: First, that appellants' conduct did not amount to solicitation, Slip Opinion at 7–8; and second, that even if it did, it was privileged under Sections 766 and 767 of the Restatement of Torts, *id.* at 8–13.

–1–

The order of the lower court should be vacated, but I do not think the decision should rest either upon the Code of Professional Responsibility or upon the law of business relations. Instead I think it should rest on appellants' First Amendment rights as defined by the United States Supreme Court in its recent decision in *Bates v. State Bar of Arizona,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977).[1]

–2–

The facts in *Bates* were as follows. The appellants were two attorneys who were members of the Arizona State Bar. The Arizona Supreme Court had adopted a disciplinary rule that prohibited members of the Bar from advertising in a newspaper. The appellants nevertheless did advertise; their advertisement said that their "legal clinic" offered "legal services at very reasonable fees", and listed their fees for uncontested divorces, uncontested adoptions, simple personal bankruptcies, and changes of name. The State Bar's Presi-

1. In fairness to the lower court it should be noted that *Bates* was filed on June 27, 1977, almost two months after the lower court's order. Judge HOFFMAN's opinion suggests in footnote 5, that the constitutional issue need not be considered because of his conclusion that appellants' conduct was privileged as a matter of the law of torts. However, *Bates* has changed the law of tortious interference with business relations (as well as the law under the Code of Professional Responsibility). Therefore, to define appellants' rights it is essential to consider the impact of *Bates*. *See* discussion *infra*.

dent filed a complaint against appellants. After various proceedings pursuant to the complaint the Board of Governors of the State Bar recommended that each appellant be suspended from the practice of law for one week. Appellants appealed to the Arizona Supreme Court. They admitted violating the disciplinary rule prohibiting advertising but argued, among other matters, that the rule infringed their First Amendment rights. A plurality of the Arizona Supreme Court rejected this argument, and held the rule valid (although the court reduced the sanction to censure only because it found that appellants had acted in good faith). On further appeal the United States Supreme Court reversed this holding, concluding that the rule violated appellants' First Amendment rights.

To be sure, *Bates* is distinguishable from the present case on the facts. In *Bates* the solicitation was of the public; here it was of clients of appellees' firm.[2] This factual difference, however, is of no legal significance; if anything, it makes this case a clearer one than was *Bates*. The correctness of this conclusion becomes apparent as one examines the reasoning of the Court in *Bates*.[3]

--a--

First the Court in *Bates* recognized its earlier decisions holding that the First Amendment protects "commercial speech", which may be defined as speech that "propose[s] a mundane commercial transaction", where "the speaker's in-

**2.** I disagree with Judge HOFFMAN that there was no solicitation. There was no solicitation in the sense of barratry, nor any that involved either fomenting litigation or the sort of conduct described in *Klensin v. Bd. of Gov. of Pa. Bar*, 312 Pa. 564, 168 A. 474 (1933). These are not the only kinds of solicitation, however. "Solicitation" means "to solicit", and one meaning of "to solicit" is "to seek eagerly or actively". Webster's Third New International Dictionary 2169 (1965). By writing the clients of appellees' firm, appellants "eagerly or actively" sought their business.

**3.** BLACKMUN, J., delivered the opinion of the Court; BRENNAN, WHITE, MARSHALL, and STEVENS, JJ., joined him. The other Justices filed, among them, two opinions concurring in part and dissenting in part, and one opinion dissenting in part.

terest is largely economic." 433 U.S. at 364, 97 S.Ct. at 2699. This is because:

> The listener's interest is substantial: the consumer's concern for the free flow of commercial speech often may be far keener than his concern for urgent political dialogue. Moreover, significant societal interests are served by such speech. Advertising, though entirely commercial, may often carry information of import to significant issues of the day. . . . And commercial speech serves to inform the public of the availability, nature, and prices of products and services, and thus performs an indispensable role in the allocation of resources in a free enterprise system. *Id.* at 364, 97 S.Ct. at 2699 (citations omitted).

It was clear in *Bates* that the appellants' advertisements were commercial speech; it was also clear that the disciplinary rule "serve[d] to inhibit the free flow of commercial information and to keep the public in ignorance." *Id.* Therefore, the Court concluded, the question was whether there was any justification for prohibiting the appellants to advertise.

This question is precisely the question here. Appellants' letters were a form of commercial speech. The fact that they were addressed to specific individuals rather than to the public generally in no way affects this conclusion. Appellants' interest in sending the letters was "largely economic"; and the letters "proposed a mundane commercial transaction."

–b–

Next the Court in *Bates* examined in turn each of a number of justifications for prohibiting the appellants to advertise. It is unnecessary to refer to all of these; three were the most important. These three were: That advertising would have an adverse effect on professionalism; that any advertising would be inherently misleading; and that advertising would have an adverse effect on the administration of justice. The Court rejected these justifications, reasoning as follows: It used to be that law was regarded by

lawyers as a form of public service and "above" trade. This attitude discouraged advertising as unethical. Today, however, we recognize that lawyers are not "above" trade; like many others, they earn living by charging for their services. Nor do we regard it as necessarily undignified for professions to advertise; other professions, such as bankers and engineers, advertise and are not regarded as undignified. Moreover, because lawyers do not advertise, many persons do not obtain a lawyer, even when they know they need one, either because they are afraid of the cost or because they can not find a competent lawyer. It is true that advertising might be misleading, but it need not be; it depends upon the sort of legal services advertised, and upon what is said. It is also true that advertising might increase use of the judicial machinery, but that is not the same as saying that it would have an adverse effect on the administration of justice. To the contrary: At present the middle 70% of the public is not adequately served by the legal profession. It would be better if these persons were adequately served, even if that meant more lawsuits. Advertising can help to ensure that they will be adequately served. It is appropriate that advertising should be resorted to for this purpose, for it is "the traditional mechanism in a free-market economy for a supplier to inform a potential purchaser of the availability and terms of exchange." At 376, 97 S.Ct. at 2705. Consequently, "[a] rule allowing restrained advertising would be in accord with the bar's obligation to 'facilitate the process of intelligent selection of lawyers, and to assist in making legal services fully available.' " *Id.* (quoting from the Code of Professional Responsibility).

This reasoning is dispositive here. It is true that appellees' clients already had, and therefore did not need to seek, a lawyer, specifically, appellees. That fact is of no significance, however. The advertisement upheld in *Bates* would be read by *two* different classes of persons: those who had no lawyer, and those who (as was true of appellees' clients) did have a lawyer. The essence of the Court's reasoning is that persons in *both* of these classes have a right to learn,

through advertising, that a given lawyer offers given legal services at a given price.  If as a result a person already represented decides to change, and to retain the lawyer identified in the advertisement, so be it.

—c—

Finally, the Court in *Bates* noted a number of qualifications to its conclusion that the First Amendment protected "restrained advertising."  Thus it noted that it did not have to consider advertising that included a claim relating to the quality, as distinguished from the availability and price, of legal services.  At 366, 97 S.Ct. 2691, 2700.  Also, that it did not have to consider a claim that the advertising in question was deceptive, or misleading, or false, or extravagant.  *Id.*  Also, that it did not have to "resolve the problems associated with in-person solicitation of clients—at the hospital room or the accident site, or in any other situation that breeds undue influence   .   .   . ."  *Id.*

The same may be said here.  There is no finding that appellants' letters were in any way inaccurate, or that appellants engaged in any conduct that could be characterized as undue influence.  The lower court does in one of its findings (No. 18) find that one of the appellants, Alan B. Epstein, deposited to his account "a referral fee paid by an out-of-state attorney to [appellees'] firm for a case being handled by Mr. EPSTEIN."  We cannot tell from the record whether this conduct, or other conduct by other of appellants, would support a claim by appellees in quasi contract or quantum meruit.  We may assume for sake of discussion that appellees do have, and will be able to recover on, a quasi contract or quantum meruit claim against some or all of appellants.  That fact is no justification for enjoining appellants from exercising their First Amendment right of commercial speech.  Because appellants' First Amendment rights have been violated I concur in the conclusion reached by HOFFMAN, J., that the order must be vacated.