540

## In re Anonymous No. 26 D.B. 78

Disciplinary Board Docket no. 26 D.B. 78.

## REPORT OF THE HEARING COMMITTEE

## I. STATEMENT OF THE CASE AND FINDINGS OF FACT

On or about May 18, 1978, the Office of Disciplinary Counsel filed a petition for discipline against respondent, asserting that respondent's conduct in mailing in January of 1978 a number of documents to members of the general public who were not at the time clients of respondent and who had not at the time sought to be represented by him violated two Disciplinary Rules: D.R. 2-103(A) and D.R. 2-103(B).

On or about June 15, 1978, respondent filed an answer admitting that he had mailed the documents in question, but denying that this mailing violated either of the Disciplinary Rules in question.

Subsequently, the parties agreed upon a stipulation of facts which was reduced to writing and of-

fered as Exhibit 1 at a hearing before this hearing committee on February 1, 1979. Since with minor exceptions, Exhibit 1 is the record here, the hearing committee adopts that stipulation and the annexed exhibits as its "Findings of Fact."

## II. DISCUSSION

Disciplinary Counsel asserts that respondent's mailing violates the following Disciplinary Rules:

D.R. 2-103(A). "A lawyer shall not recommend employment, as a private practitioner, of himself, his partner, or associate to a non-lawyer who has not sought his advice regarding employment of a lawyer."

D.R. 2-103(B). "A lawyer shall not compensate or give anything of value to a person or organization to recommend or secure his employment by a client, or as a reward . . . by a client. . . ."

At the hearing of February 1, 1979, the parties brought to the attention of this committee the following order of the Pennsylvania Supreme Court:

"And now, this 16th day of January, 1979, the Canons of Professional Responsibility insofar as they prohibit advertising by lawyers are temporarily suspended."

Respondent contends that this order is an added reason to dismiss the instant proceedings.

As we understand his position, Disciplinary Counsel contends that respondent is in violation of the cited rules because his mailing recommended employment of himself and his associates for legal services and so contravenes D.R. 2-103(A); and further, respondent gave something of value in that respondent offered to those joining his family re-

tainer plan lifetime free will service and to those who joined his plan by a particular date, a legal service for free for which there would otherwise be a charge (the preparation of the then current income tax return), and his conduct thus contravenes D.R. 2-103(B).

To this, respondent replies that his mailing constituted nothing more than an advertisement mailed to the recipients rather than made available to them in a newspaper or other form of mass media communication. Implicit in his argument is the admission that he recommended the employment of himself and his associates for legal services, but he asserts that he is permitted to do this under the applicable decisions of the United States Supreme Court and the Pennsylvania Supreme Court. He denies the assertion that his lifetime free will service and his free income tax preparation for such persons as joined his plan by the given date were the giving of compensation violative of D.R. 2-103(B); rather, he asserts that the will aspect was simply part of the legal service for which the prospective client would pay by paying the retainer and joining the plan, and the free tax preparation was both de minimis and not the kind of thing envisioned by the rule when it speaks of compensation. He argues that the entire thrust of D.R. 2-103(B) in terms of compensation necessarily involves a third party who is to receive the compensation in return for having secured the client for the attorney.

We are confronted here with a case which falls somewhere between established guideposts. On the one hand, there is the decision in Bates v. State Bar of Arizona, 433 U.S. 350 (1977), which holds that truthful advertising of routine legal services is

protected by the First and Fourteenth Amendments against the blanket prohibition by a state. We assume that that decision forms the basis of the order of the Supreme Court of Pennsylvania cited above. On the other hand, we are admonished in Ohralik v. Ohio State Bar Association, 436 U.S. 447 (1978), and in Adler, Barish, Daniels, Levin & Creskoff v. Epstein, 482 Pa. 416, 393 A. 2d 1175 (1978), appeal dismissed and cert. denied, 442 U.S. 907 (1979), that certain types of personal solicitation by a lawyer of prospective clients may still be barred by the state under the Code of Professional Responsibility. That result at least pertains where the solicitation imposes undue pressure upon the person solicited and is likely to encourage speedy and perhaps uninformed decision-making as opposed to informed and reliable decision-making.

Since Disciplinary Counsel has indicated a reliance upon D.R. 2-103(A) and (B), often termed "solicitation rules," it might seem that the present case could be decided if one were able to characterize the behavior here either as advertising or solicitation. As the parties themselves recognized, however, the question is far more complex. All advertising is a form of solicitation, and only certain forms of solicitation can be regulated by the state. To the extent that the Supreme Court of Pennsylvania's order suspends those disciplinary rules which prohibit advertising, we are informed of the conclusion but not its manner of application. Some part of D.R. 2-103(A) and (B), especially (A), may well have been suspended, if not by the Supreme Court of Pennsylvania's order, at least by the United States Supreme Court's decisions. Certainly where the recommendation of employment carried overtones of political action and association, solici-

tation otherwise covered by D.R. 2-103(A) may be protected under In re Primus, 436 U.S. 412 (1978), decided the same day as Ohralik. Even Ohralik seems to recognize that the label of solicitation is not enough to invoke state disciplinary sanctions; rather, a more exacting analysis is required of the particular behavior which has been challenged.

From all of the foregoing authorities, one can discern the familiar problem of reconciling competing policies, in this situation the policies underlying the First Amendment right of free speech and the policy favoring a flow of relevant information to consumers versus the policies underlying the traditional concerns of the bar and the state courts with the behavior of practicing attorneys.

In this case, there are a few simplifying assumptions which the parties have agreed to or the hearing committee has adopted. One of the stipulations entered into by the parties, Paragraph 11 of Exhibit 1, is that the documents mailed by the respondent "make no false, deceptive or misleading representations."[1] A major point made in Bates is that the protective penumbra of the decision is limited to legal advertising which is truthful. In Part IV of the opinion of the court, 433 U.S. at 383, it is noted that advertising in a commercial context which is false, deceptive or misleading is subject to restraint.

Further, the parties stipulated, Exhibit A, Paragraph 12, that the documents involved "make no self-laudatory statements." Again, this serves to

---

1. In retrospect, it is less than clear that the significance of this stipulation was appreciated by the parties. Notwithstanding our concern, however, that some of the language of the mailed material, particularly the reference to the drawing up of a will at no charge, might pose questions of deceptiveness, we are deciding the case as it was presented to us under the stipulation.

distinguish the case from the caveat in Bates, 433 U.S. at 383-384, that references to the quality of legal service "may be so likely to be misleading as to warrant restriction."

Finally, the hearing committee, in light of its uncertainty as to the meaning of the Supreme Court of Pennsylvania's order, determined to treat direct mail advertising as analogous to newspaper or other media advertising. Put differently, we chose not to allow the method of advertising, in the sense of its media context, to influence our opinion in this gray area.

Though the assumptions shorten our task, they still leave us with a number of questions. On its facts, this case is both similar in some ways and dissimilar in others to those in the key decisions upon which the parties rely, with the exception of Ohralik. Respondent's behavior here was not so extreme as that of Ohralik—it was not face-to-face importuning of young victims of an accident, still suffering its effects. Ohralik is more of interest because of the efforts made in the opinion to shorten the reach of Bates, and to emphasize, in effect, what was not decided in Bates.

Like Bates, the present case in part involves a statement that certain routine legal services are available from an attorney for a stated fee. The "copy" is more lengthy than in Bates, taking the mailing as a whole, and the service is to be provided pursuant to a "Plan" and not on an item-by-item basis. These two differences, however, probably fall short of result determinative distinctions.

Unlike Bates, the mailing here also involved an offer of at least one free service based on an early reply and provided the means for a rapid reply through the signature card and a self-addressed envelope. In the latter respect, the case is facially

similar to Adler, Barish, supra, where the mailing to the Adler, Barish clients contained signature cards and return envelopes. What is lacking here, but present in Adler, Barish, are the elements of a claim already in the investigatory or litigation stage, and the possible implication to the client that with the associate's departure from Adler, Barish, the claim might somehow be jeopardized unless the associate previously involved continued to handle it.[2] To that extent, there was a need to act and a coercive element in Adler, Barish only faintly present here in the exhortation to take advantage of the free income tax preparation offer through an early response.

Last, we would note the similarity to In re Primus, supra, in the sense that a "personal" letter was involved there and here, but the similarity ends with that superficial element. While Primus involved an even more pointed invitation to action than here, the decision there rested on protection of important rights beyond speech alone, rights requiring greater latitude than an ordinary commercial appeal as in Bates. Respondent here plainly acted in a commercial context, and none of the decisive elements in the Primus case are present.

We are left, then, with something more than Bates, less than Ohralik and not quite like Adler, Barish. The Pennsylvania Supreme Court in Adler,

---

2. We recognize, of course, that Adler, Barish involved a claim for tortious interference with business relations, and the disciplinary rule implications arose in answer to defendants' contentions that their conduct was privileged and protected by Bates and other decisions: 393 A. 2d at 1179-1181, 1186. As we note below, the Pennsylvania Supreme Court found Ohralik more apposite than Bates.

Barish, 482 Pa. at 427, 393 A. 2d at 1180-1181, quoted from Ohralik the following language:

"As applied in this case, the disciplinary rules are said to have limited the communication of two kinds of information. First, appellant's solicitation imparted to Carol McClintock and Wanda Lou Holbert certain information about his availability and the terms of his proposed legal services. In this respect, in-person solicitation serves much the same function as the advertisement at issue in Bates. But there are significant differences as well. Unlike a public advertisement, which simply provides information and leaves the recipient free to act upon it or not, in-person solicitation may exert pressure and often demands an immediate response, without providing an opportunity for comparison or reflection. The aim and effect of in-person solicitation may be to provide a one-sided presentation and to encourage speedy and perhaps uninformed decisionmaking; there is no opportunity for intervention or counter-education by agencies of the bar, supervisory authorities, or persons close to the solicited individual. The admonition that 'the fitting remedy for evil counsels is good ones' is of little value when the circumstances provide no opportunity for any remedy at all. In-person solicitation is as likely as not to discourage persons needing counsel from engaging in a critical comparison of the 'availability, nature, and prices' of legal services, cf. Bates, 433 U.S. at 364, 97 S.Ct. at 2699, it actually may disserve the individual and societal interest, identified in Bates, in facilitating 'informed and reliable decisionmaking.' Ibid." 436 U.S. at 457, 98 S.Ct. at 1919 [footnotes omitted].

The Pennsylvania Supreme Court then went on

to equate the conduct in Adler, Barish with the conduct in Ohralik:

"Just as in Ohralik, appellees' conduct frustrates, rather than advances, Adler Barish clients' 'informed and reliable decisionmaking.' After making Adler Barish clients expressly aware that appellees' new firm was interested in procuring their active cases, Epstein provided the clients the forms that would sever one attorney-client relationship and create another. Epstein's aim was to encourage speedy, simple action by the client. All the client needed to do was to 'sign on the dotted line' and mail the forms in the self-addressed, stamped envelopes. Other appellees condoned Epstein's conduct on behalf of appellees' new firm. Indeed, upon their departure, appellees Weisbord and Wolf informed Adler Barish clients that they could discharge Adler Barish and retain appellees.

"Thus, appellees were actively attempting to induce the clients to change law firms in the middle of their active cases. Appellees' concern for their line of credit and the success of their new law firm gave them an immediate, personally created financial interest in the client's decisions. In this atmosphere, appellees' contacts posed too great a risk that clients would not have the opportunity to make a careful, informed decision. . . ." 482 Pa. at 427-28, 393 A. 2d at 1181.

On balance, we feel that factors important to the result in Adler, Barish are not present here. First, the situation in Adler, Barish was much closer to an in-person solicitation than simply a mailing since the mailings there were preceded by telephone conversations. Second, the mailings were to persons who already had active cases in suit, and a

person solicited probably felt that he had to make a rapid decision concerning the subject matter of the mailings because his case might depend upon it. In the instant matter, the recipients of the mailings did not have active litigation and so were not under the same kind of pressure to make a quick judgment. It is true that in the instant case a free service, the preparation of the tax return, was offered to such persons as made a decision to join the plan, but they were given some six weeks within which to make the decision and still receive the free service. We do not believe that that length of time can be characterized as coercive or a form of undue pressure.

Further, while the Supreme Court's opinion in Adler, Barish does not discuss the concept of "solicitation" in an historical context, the opinion written by Judge Hoffman, joined in by two of his fellow judges, in the Superior Court consideration of the same case, 252 Pa. Superior Ct. 553, 382 A. 2d 1226 (1977), does. Judge Hoffman suggests that the real reason why solicitation is evil is because "[t]he common thread in cases involving the issue of solicitation is fomenting litigation or other legal action where none was contemplated by the client." 252 Pa. Superior Ct. at 562, 382 A. 2d at 1230. We do not think that the mailing in the instant case involved solicitation in this sense.

In sum, we believe that although respondent did recommend employment of himself and his associates to the persons to whom the mailings were sent for legal services, and thus on the face of it violated D.R. 2-103(A), his activities were sufficiently close to those found constitutionally protected under the First Amendment in Bates to be exonerated.

The question of D.R. 2-103(B) is perhaps a closer question, but on balance this committee does not believe that the aspect of the mailings which involved a free tax return and free wills is sufficient to constitute the kind of compensation contemplated by the rule, particularly when there is no third party involved.

Accordingly, we draw the following conclusions.

## III. CONCLUSIONS OF LAW

1. Petitioner's conduct was within the zone of constitutional protection afforded truthful advertising and hence cannot be deemed a violation of D.R. 2-103(A).

2. Petitioner did not violate D.R. 2-103(B) because there was no third party involved to whom compensation was paid and because to the extent that any compensation was paid at all, it was de minimis.

## IV. RECOMMENDATION

For the foregoing reasons, it is respectfully recommended that the instant petition be dismissed. We are constrained, however, to make two other comments. First, the order of the Supreme Court of January 16, 1979 obviously requires clarification, and we assume that process is going forward. Second, while we have concluded that in the present state of uncertainty as to the "advertising" question respondent should not be sanctioned, we believe that his copy, especially his "free" promotions are inappropriate and could have been sanctioned as misleading but for the stipulation. We would suggest that any new rules in this area bar this kind of appeal to the public.

## ORDER

HENRY, *Chairman,* And now, August 17, 1979, the report and recommendation of the hearing committee filed June 28, 1979, pursuant to §89.181 of the Disciplinary Board Rules, finding that no violation had been established and that petition for discipline be dismissed is accepted and there being no exceptions filed, it is ordered and decreed that the charges against respondent be dismissed.