HENINGER & HENINGER,
P.C., Appellee,

v.

DAVENPORT BANK & TRUST COMPA-
NY and Richard L. Braunstein as Exec-
utors of the Estate of David D. Palmer,
Deceased, Appellants.

No. 67600.

Supreme Court of Iowa.

Nov. 23, 1983.

R. Richard Bittner and Robert D. Lambert of Betty, Neuman, McMahon, Hellstrom & Bittner, Davenport, for appellants.

John A. McClintock and David L. Brown of Hansen, McClintock & Riley, Des Moines, for appellee.

Considered by REYNOLDSON, C.J., and UHLENHOPP, HARRIS, McCORMICK, and McGIVERIN, JJ.

UHLENHOPP, Justice.

This appeal involves the propriety of a partial allowance of a claim against the executors of a decedent's estate for legal fees, based on services rendered to the decedent during his lifetime.

Claimant Heninger & Heninger, P.C. (Heningers), is a law firm in corporate form in Davenport, Iowa. (We use the name "Heninger" to refer to the elder Heninger and the name "Heningers" to refer to the law firm.) David D. Palmer, a man of wealth, had been a client of Heninger or Heningers on some previous occasions. The first professional contact with Palmer occurred in 1943, when Heninger was an associate in the Lane & Waterman law firm. This was in connection with an antenuptial contract between Palmer and his fiancee, whom he later married.

In 1974 Palmer and his wife were having problems; in addition, Palmer had suffered a stroke. Palmer feared that his wife was taking control of his business affairs and spreading word that he was incompetent. He also wanted her out of a Florida home which they owned together and used for corporate as well as residential purposes. At the time, Palmer was counseling with Attorney Richard L. Braunstein of Washington, D.C., primarily with reference to various business interests. During Palmer's illness Braunstein had arranged for Mrs. Palmer to become an officer of Palmer's principal corporation and a member of its executive committee.

In May 1974, Heninger, who had been successful in his previous representations of Palmer, received a call from Palmer to come at once to New York to discuss Palmer's problems. Heninger immediately flew to New York. Palmer was distraught. Discussions occurred among Palmer, Heninger, and Braunstein in an effort to ascertain the best course of action. Braunstein had the Palmers' antenuptial contract with him and discussed it with Heninger.

As a solution to Palmer's problems, Heninger suggested a marriage dissolution in Iowa, accompanied by an injunction. Heninger pointed out that Iowa has no-fault dissolution. Eventually the three men decided that Palmer would file a marriage dissolution action under the Iowa statute and simultaneously seek a temporary injunction restraining Mrs. Palmer from interfering with Palmer's business affairs and from occupying the Florida home.

What Heningers was to do for Palmer is clear from the evidence. It was to represent him in the dissolution, and Braunstein would also utilize its services from time to time in connection with Davenport matters affecting Palmer and his corporate interests; Heningers would represent Palmer locally. What is not clear from the evidence is, who was to pay Heningers' fees? Braunstein's version of the discussion was that Heningers would be paid by Palmer's corporation. This would create a corporate tax deduction based on the ground that a major part of the underlying controversy related to corporate control. Heninger's version was that a major part of the fees would be paid by the corporation because of the corporate control issue and the balance of the fees would be paid by Palmer himself because of his personal involvement in the marriage dissolution. Palmer died before the fee dispute was resolved, and we do not have his version of the discussion. He did personally pay Heningers $3120 near the beginning of the services.

Heningers commenced and maintained the dissolution suit, and obtained the temporary injunction. It expended substantial time and effort; the litigation was complicated, necessitated two appeals, and involved a large amount of property. During the litigation Heningers regularly billed the corporation on a time basis at $60 per hour, and received payment. Lane & Waterman initially represented Mrs. Palmer in the dissolution case.

Two methods of settling the dissolution suit were conceived. Eventually, however, settlement of the suit appeared unlikely

and a movement developed to get Heningers out of the case. We have been unable to ascertain from the record the real reason for the movement—whether it was dissatisfaction by Palmer regarding progress in the lawsuit, apprehension by Braunstein over client control, or the reason given by Braunstein—conflict of interest on the part of Heninger growing out of his part in the 1943 antenuptial contract. Lane & Waterman withdrew from the litigation because of a possible conflict of interest.

Heningers obtained an opinion from Professor Paul M. Neuhauser that it would not have a problem of ethics if Mrs. Palmer required Heninger to testify. Notwithstanding, Palmer required Heningers to withdraw, on Braunstein's advice. In withdrawing, Heningers turned over its records to Palmer's attorneys, and Heninger was required to give a deposition at the request of Mrs. Palmer's attorney. This necessitated Heninger's preparing for the deposition. Heningers' fee statements to the corporation were fully paid, amounting to $131,633.20 over the whole period.

Soon afterward, Heningers sent Palmer personally a bill for the same items as in the previous bills to the corporation, but calculated at $30 per hour as the claimed balance due, in the amount of $53,760 allowing for $3120 originally paid by Palmer. Later Heningers sent Palmer a second bill, for $4176.89 as a "withdrawal fee", apparently for turning over the case and preparing for and giving the deposition. Palmer refused to pay these bills. Heningers did not bring suit for the fees during Palmer's lifetime.

About two years later, Palmer died. Heningers filed two claims in the Palmer probate proceeding for the amounts of the two bills. The executors disallowed the claims, and counterclaimed for $131,543.20 for alleged unreasonable fees and expenses paid by the corporation and for $31,854 for alleged personal use by Heningers of the corporation's airplane. The executors further alleged that the corporation had assigned its claims to them.

The parties tried the case to the court, which allowed $12,305.05 on Heningers' first claim and nothing on the second one. The court did not allow the counterclaim. The executors appealed and Heningers cross appealed.

The parties argue numerous points and we have considered them all. In this opinion we deal with the issues which warrant elaboration. We initially consider the fundamental issues of Palmer's *liability* for fees and of the *amount* of the fees. We then take up subsidiary issues.

I. *Palmer's liability for fees.* The liability issue involves both facts and law.

A. Upon consideration of the evidence, the trial court found three basic facts: first, that Palmer employed Heningers to represent him; second, that Heningers did represent him; and third, that the parties did not have a meeting of the minds as to how Heningers' fees were to be paid. The first and second basic facts are unquestioned. As to the third basic fact, Heninger thought from the discussions that the corporation was to pay the major portion of the fees (Heningers billed it for two-thirds) and that Palmer was to pay the minor portion (Heningers billed him for one-third). The court found that Heningers did not prove Palmer's understanding as to who was to pay the fees. The court held that a meeting of minds was not proved as to how the fees were to be paid, but since Palmer unquestionably did employ Heningers to represent him and it did represent him, he (and now his estate) is liable for Heningers' services but is entitled to credit for the portion Heningers billed the corporation pursuant to Heninger's understanding. Oral testimony and documentary evidence support these findings.

On the other hand, oral testimony and documentary evidence support the executors' contention a meeting of minds did occur that Heningers was to bill the corporation in full. The executors assert that Heningers did so, and was fully paid.

Were these claims reviewable de novo by us, we would have to resolve this conflict of evidence. The claims are for fees based

on services rendered to the decedent during his lifetime, and they stand on no different footing than other claims in probate. They are triable by ordinary proceedings, and the fact findings of the trial court, if supported by substantial evidence, have the force of special verdicts. Iowa Code § 633.33 (1981) ("Actions ... for the establishment of contested claims shall be triable in probate as law actions...."); Iowa R.App.P. 14(f)(1) ("Findings of fact in a law action, which means generally any action triable by ordinary proceedings, are binding on the appellate court if supported by substantial evidence."). On the other hand, the trial court's conclusions of law are open to consideration by us. *Solbrack v. Fosselman*, 204 N.W.2d 891, 893 (Iowa 1973) (quoting *Pitz v. Cedar Valley Egg & Poultry Co.*, 203 N.W.2d 548, 550 (Iowa 1973)). The fact findings here have substantial evidentiary support and bind us.

■ B. Under the trial court's findings the established legal principle comes into operation, as the court held, that when a person performs services for another at the latter's request, the latter is liable for the services in the absence of special circumstances not appearing here, such as a family relationship indicating a gratuity was intended. We stated in *Olberding Construction Co. v. Ruden*, 243 N.W.2d 872, 875 (Iowa 1976) (citation omitted):

In their first issue stated for review, defendants assert trial court erred in finding the Company was entitled to $5,114.85 as reasonable compensation for the work done on the Ruden home. All parties to this appeal agree the question is one of fact.

With respect to this issue, the parties have narrowed the question before us to one of the reasonable value of the services rendered by the Company. There is no claim that an express contract existed as to the amount of compensation to be paid. It is well settled that there may be an implied contract on a point not covered by an express one, and where there is no agreement as to the amount of compensation, the law implies a promise to pay reasonable compensation.

*See also* Restatement of Restitution § 107(2) (1937) ("In the absence of circumstances indicating otherwise, it is inferred that a person who requests another to perform services for him ... thereby bargains to pay therefor."); 66 Am.Jur.2d *Restitution and Implied Contracts* § 21 (1973); 98 C.J.S. *Work & Labor* § 11(b) (1957). Heningers' pleadings allow this basis of recovery under notice pleading. Iowa R.Civ.P. 69(a). *See* Iowa Code § 633.44 (1981). Heningers was not required to prove more than necessary to entitle it to relief. Iowa Code § 619.9.

■ Had the trial court held on the evidence that Heninger and Palmer intended Heningers was to be paid solely by the corporation, a different problem would exist; the defense of payment would confront Heningers. But the court found that Heninger intended Heningers was to be paid partially by the corporation and partially by Palmer, and that Palmer's intention was not established. In that situation the rule applies which is stated thus in 66 Am. Jur.2d *Restitution and Implied Contracts* § 7 (1973):

Thus, the mere fact that the parties have attempted to make an express contract but have not succeeded in making it enforceable with respect to some of its terms does not prevent the implication of a promise to pay for benefits conferred thereunder. The generally recognized doctrine is that the fact that a contract is invalid because the minds of the parties did not meet as to some of the essential terms thereof, either because of a mutual mistake or uncertainty therein, does not require that a party thereto who furnishes something to the other party, relying upon the terms as he understood them, be without a remedy. In such case a promise to pay the reasonable value of the benefits is implied.

*See also* 98 C.J.S. *Work & Labor* § 30 (1957).

■ C. The executors argue in connection with the liability issue that a presump-

tion of unfairness attaches to a fee agreement made after the establishment of the attorney-client relationship and that an ambiguous fee contract is construed against the attorney. We need not consider these contentions as they have no application to the facts as found. The court found the fee agreement claimed by Heningers was not proved. Factually, it found that Palmer employed Heningers to perform legal services and it performed services, and those facts are unquestioned.

We uphold the trial court's finding that Palmer (and now his executors) is liable for Heningers' services.

II. *Amount of the fees.* On the second basic issue we again encounter legal and factual problems.

■ A. Parties to a contract for services may of course specify the compensation which is to be paid. Attorneys can contract to handle certain litigation for a specified lump percentage (in some cases) or sum, or at a specified rate per hour or day, or in accordance with some other measure. In the absence of specification, a person who performs services pursuant to request is entitled to the reasonable value of the services. *Drake v. Block*, 247 Iowa 517, 522, 74 N.W.2d 577, 580 (1956); 17 Am.Jur.2d *Contracts* § 344 (1964) ("Where a contract makes no statement as to the price to be paid, the law invokes the standard of reasonableness, and the fair value of the services or property is recoverable."); 98 C.J.S. *Work & Labor* § 66(2) (1957).

■ In the case of an attorney's services, "reasonable value" is not ascertained by a single factor such as time expended. The fact finder looks at the totality of the circumstances including the nature and extent of the services, the difficulty and complexity of the questions presented, the amount involved, the time expended, the responsibility assumed, the customary charge for similar services, the result obtained, and the experience of the attorney. *In re Marriage of Jennerjohn*, 203 N.W.2d 237, 245 (Iowa 1972). The fact finder then determines the amount of money which the services are reasonably worth.

■ B. In this case the trial court employed the principle just stated. As to the factor of the amount of time expended, Attorney-Accountant Sidney B. Smith audited Heningers' time records. The court adopted that audit as correct. As to the value Heningers placed on the time of the three attorneys who worked on the case, the court, acting as an expert itself, *Gabel v. Gabel*, 254 Iowa 248, 250, 117 N.W.2d 501, 503 (1962); *In re Dehner's Estate*, 230 Iowa 490, 494, 298 N.W. 656, 658 (1941), substantially discounted the value of the time of the junior partner and discounted the value of an associate's time even more. Thus proceeding, the court determined that all of the services rendered were reasonably worth $131,304, plus cash advanced of $12,634.25, for a total of $143,938.25. The court then deducted $131,633.20 which the corporation had paid, leaving $12,305.05 for the executors to pay. In the process the court disallowed anything for Heningers' "withdrawal fee" of $4,174.89.

The executors vigorously attack the court's findings as to the reasonable value of the services. Among their contentions they argue that Heningers overstated the time expended. The court, however, did not adopt Heningers' statement. It used Smith's audit, which constituted substantial evidence. Similarly the executors argue that Heningers valued the time of all of its three lawyers at the scale of the senior partner. But the court did not adopt Heningers' estimates of value of time. It substantially discounted the time of the junior partner and the associate. This discount accounts in material part for the court's reduction in the amount of Heningers' claims.

■ The executors also argue, as we understand them, that Heninger had no right to use the junior partner and associate. The Code of Professional Responsibility does not prohibit division of a fee with a partner or associate. DR 2–107. Palmer must have known when he employed Hen-

inger that Heninger would use his firm attorneys. For Heninger to perform all the work personally would have resulted in substantial inefficiency—use of a senior partner's time to perform functions that could be done at about half the cost by use of other attorneys in the firm. We find no analogy in the different situation involving fees under section 815.7 of the Iowa Code. *See Hulse v. Wifvat*, 306 N.W.2d 707 (Iowa 1981). We do not uphold the contentions of the executors as to the value of the services.

C. We do find merit, however, in one issue raised by the executors. Heningers billed the corporation for $5158.95 as part of its expenses, and the corporation paid the bill. The fact developed that this item was for Professor Neuhauser's opinion on Heningers' ethical question.

 When a client retains an attorney, the responsibility is on the attorney himself to ascertain whether he has a conflict of interest or other ethical impediment to acceptance of the employment; the responsibility is not on the client to investigate and decide that question for the attorney. Absent an explicit agreement by the client to pay for an opinion on a problem of the attorney's ethical responsibility—and that would be a most unusual case—we hold the cost of an outside opinion is on the attorney if he choses to obtain one. No such agreement by Palmer appears here. The court should have reduced its allowance of $12,305.05 by $5158.95 to $7146.10.

 III. *Ethical considerations.* The executors argue that Heningers cannot recover because it violated professional ethics in representing Palmer in the first place and also in suing for the balance of its fees and charging excessive fees. We will assume without deciding that these alleged ethical violations, if established, would bar Heningers from recovering and, as to the charge of unethical representation, that a violation would require Heningers to refund the fees it received as the executors contend in their counterclaim.

A. The executors' argument that Heningers violated professional ethics in representing Palmer at all is predicated on the contention that from the outset Heninger knew, or the fact was obvious, he would be called as a witness for Palmer to uphold the 1943 antenuptial contract.

Initially we note that this is not a case in which an attorney remained in the case after he was told his testimony would be necessary for his client. Heninger did withdraw at that time, although he thought the contention he would have to testify was not true. In this case the argument is Heninger should not have accepted the case in the first place.

Apparently a bitter controversy rages between Heninger and Braunstein as to whether Heninger was in fact to be called as a witness for Palmer. Heninger contends this was a ruse to get him out of the case so that Braunstein could maintain client control; the dissolution case was in fact subsequently settled and Heninger never was called as a witness for Palmer. Braunstein contends that Heninger's presence as both attorney and witness in the dissolution lawsuit would have hurt Palmer's case if that lawsuit had gone to trial. For reasons which will appear, we find no necessity to resolve this controversy. We will assume without deciding that Braunstein's version is the fact: as the dissolution case progressed, the necessity of calling Heninger as a witness for Palmer became manifest.

As the executors' argument is predicated on the claim that Heninger wrongfully accepted the employment initially, the applicable standard under the Iowa Code of Professional Responsibility is DR 5–101(C):

A lawyer shall not accept employment in contemplated or pending litigation *if he knows or it is obvious* that he or a lawyer in his firm *ought to be called as a witness*, except that he may undertake the employment and he or a lawyer in his firm may testify [regarding an uncontested matter, a formality believed to be unopposed, the nature and value of legal services, or any matter if refusal will

work substantial hardship on the client because of the lawyer's distinctive value in the case].

(Emphasis added.) Ethical Considerations 5–9 and 5–10 state with reference to this standard:

Occasionally a lawyer is called upon to decide in a particular case whether he will be a witness or an advocate. If a lawyer is both counsel and witness, he becomes more easily impeachable for interest and thus may be a less effective witness. Conversely the opposing counsel may be handicapped in challenging the credibility of the lawyer when the lawyer also appears as an advocate in the case. An advocate who becomes a witness is in the unseemly and ineffective position of arguing his own credibility. The roles of an advocate and of a witness are inconsistent; the function of an advocate is to advance or argue the cause of another, while that of a witness is to state facts objectively.

Problems incident to the lawyer-witness relationship arise at different stages; they relate either to whether a lawyer should accept employment or should withdraw from employment. Regardless of when the problem arises, his decision is to be governed by the same basic considerations. It is not objectionable for a lawyer who is a potential witness to be an advocate if it is unlikely that he will be called as a witness because his testimony would be merely cumulative or if his testimony will relate only to an uncontested issue. In the exceptional situation where it will be manifestly unfair to the client for the lawyer to refuse employment or to withdraw when he will likely be a witness on a contested issue, he may serve as advocate even though he may be a witness. In making such decision, he should determine the personal or financial sacrifice of the client that may result from his refusal of employment or withdrawal therefrom, the materiality of his testimony, and the effectiveness of his representation in view of his personal involvement. In weighing these factors, it should be clear that refusal or withdrawal will impose an unreasonable hardship upon the client before the lawyer accepts or continues the employment. Where the question arises, doubts should be resolved in favor of the lawyer testifying and against his becoming or continuing as an advocate.

See 81 Am.Jur.2d Witnesses § 98 (1976); 7 C.J.S. Attorney & Client § 50b (1980); 7A C.J.S. § 136 (1980).

In determining whether Heninger should have accepted the employment in the first place, the crucial question is whether at that time he knew or the fact was obvious that he would have to testify. The trial court did not find an ethical violation by Heninger. Several considerations support a finding of his good faith. First, the situation is not uncommon in which an attorney is involved on one side of a transaction or occurrence, the subject matter of the transaction or occurrence subsequently goes to litigation, and the attorney is asked to represent the same client in the litigation. The circumstances in a particular case may cause the attorney to know he will be a witness in the litigation or may make that fact obvious. On the other hand, many situations may exist in which the opposite is true; the attorney's previous participation does not per se indicate he will have to give testimony. The circumstances in each situation are thus determinative.

In this case the antenuptial contract was made some thirty years previously. When Palmer asked Heninger to represent him, nothing indicated to Heninger that the contract was in dispute as to execution, content, or otherwise. Braunstein himself, who as executor is now challenging Heninger's ethics in accepting the employment, participated with Palmer in employing Heninger. Palmer, whom Heninger had served successfully in previous years, was distraught and wanted Heninger's help. We hold that Heninger did not commit an ethical violation in initially accepting employment on Palmer's behalf.

■ B. The executors also cite the ethics rules in arguing that Heningers should not have sued for its fee and that it asked an excessive fee.

As to Heningers' bringing suit, Ethical Consideration 2–25 states:

A lawyer should be zealous in his efforts to avoid controversies over fees with clients and should attempt to resolve amicably any difference on the subject. He should not sue a client for a fee unless necessary to prevent fraud or gross imposition by the client.

Heninger's understanding of the fee arrangement was that the corporation would pay the major share and Palmer would pay a minor share. Heningers billed accordingly. During his lifetime Palmer did not pay the share he was billed. After Palmer's death Heningers could either write off the balance of their fees in favor of the devisees, or it could press its claims against the executors who refused to allow them. We do not think Heningers can be justly criticized for believing that a fee writeoff would constitute a gross imposition. Attorneys should endeavor to resolve fee questions amicably, but they should not be left helpless when they render valuable service and confront an alternative of a write-off or a suit. We agree with the trial court that no ethical violation occurred.

■ As to the amount of Heningers' fee, Disciplinary Rule 2–106(A) states that an attorney shall not charge "an illegal or clearly excessive fee." Ethical Consideration 2–19 states:

The determination of a proper fee requires consideration of the interests of both client and lawyer. A lawyer should not charge more than a reasonable fee, for excessive cost of legal service would deter laymen from utilizing the legal system in protection of their rights. Furthermore, an excessive charge abuses the professional relationship between lawyer and client. On the other hand, adequate compensation is necessary in order to enable the lawyer to serve his client effectively and to preserve the integrity and independence of the profession.

The question here is whether the fee asked was "clearly excessive" so as that Heningers was unethical in charging it, either because of the hours, the rate, or otherwise. The trial court reduced the amount allowed, but we do not think this establishes the fee was per se "clearly excessive" and therefore unethical. Otherwise an attorney who has a fee reduced in the judicial process would automatically lose his entire fee because he asked a greater amount than he was allowed. Rather, the circumstances again control.

■ While the district court reduced the claim substantially, it could have allowed more under the *Jennerjohn* factors. Complex legal questions of corporate and tax law were involved on which Heningers could provide expertise—in addition to domestic relations law. The stakes were very high in terms of the amounts involved. This was reflected in other fees. Attorneys who represented Mrs. Palmer during the dissolution litigation, after Lane & Waterman withdrew, received nearly $400,000, and the executors as such were allowed interim fees of $1.9 million for services in the Palmer estate.

The trial court did not err in finding that Heningers' fee asking was not unethical.

IV. *Disposition and costs.* We thus uphold the trial court's allowance of fees to Heningers to the extent of $7146.10 and interest, and we approve the trial court's denial of the executors' counterclaim except to the extent we have disallowed Heningers recovery for the Neuhauser fee and reduced Heningers' allowance to $7146.10. We also affirm as to Heningers' cross appeal.

The trial court divided the costs in district court equally between Heningers and the executors, and acted within its authority in doing so. Iowa Code § 625.3. We assess the costs in this court to the executors.

MODIFIED AND AFFIRMED.