## Swanson & Lange v. David Miner

[623 A.2d 976]

No. 91-544

Present: **Allen, C.J., Gibson, Dooley, Morse and Johnson, JJ.**

Opinion Filed November 13, 1992

*David H. Perrin* of *Swanson & Lange*, Burlington, for Plaintiff-Appellant.

*Thomas A. Little* and *Samuel H. Press* of *Portnow, Little & Cicchetti, P.C.*, Burlington, for Defendant-Appellee.

**Morse, J.** Plaintiff, a partnership engaged in the practice of law, brought suit to collect fees for services rendered to defendant, a former client. The trial court entered judgment in favor of defendant, holding that under the strictures of Vermont's Code of Professional Responsibility, an action for recovery of attorney's fees is forbidden as a violation of public policy unless suing the client is "necessary to prevent fraud or gross imposition by the client." Code of Professional Responsibility, Ethical Consideration 2-23 (EC 2-23). We disagree and accordingly reverse.

In November 1986, defendant consulted with Nell Coogan, a partner with the law firm of Coogan, Swanson & Lange, to represent him in a divorce case. Coogan agreed to represent defendant at an hourly rate of $60, with payment of a $500 retainer. The fee agreement was not reduced to writing, al-

though it was the firm's usual practice to do so. Defendant has not disputed the existence or accuracy of the agreement, and the trial court expressly found that the rate charged was a "reasonable and ordinary rate for such services."

In July 1987, Ms. Coogan left the firm on maternity leave. The case was transferred to another partner in the firm, John Swanson. Defendant continued to accept the benefit of legal services from plaintiff for another two months, and, as found by the trial court, the services provided by Swanson were "reasonable and necessary" and "performed in a competent fashion."

Defendant, however, was unhappy that Ms. Coogan was no longer able to represent him, despite the fact that both Coogan and Swanson were members of the retained firm. Defendant stated: "I would not, never have selected him [Swanson]. . . . No, I would not have selected him as my attorney." Approximately three months before final hearing, defendant engaged a different law firm to represent him.

Defendant paid the retainer and made several payments of fees for plaintiff's legal services, but, at the time of transfer of his case, a balance of $1,988.11 remained outstanding on his account. After that time, no further payments were made. Defendant stated that he felt he had "paid for what he got" and that "I hired Nell Coogan to do a job, and I got Mr. Swanson who couldn't do the job, and I feel that the $1,547 that I paid up front in good faith is more than enough than that firm deserves . . . if you don't get a service then it's like my business, if someone comes in and has a dinner and they don't like it, it's not a good dinner, there's something wrong with it, I'm certainly not about to charge them . . . ."

Plaintiff brought suit to collect the unpaid fees approximately three years after its representation of defendant ceased, during which time plaintiff tried to negotiate a settlement of its claim. Although the trial court found that the parties had agreed to the fee, the services were competently performed, and the amounts necessary and reasonable, the court concluded, as a matter of law, that EC 2-23 of the Code of Professional Responsibility precludes a lawyer or law firm from initiating a lawsuit to collect outstanding fees from a former client, unless the ele-

ment of "fraud or gross imposition" was alleged and could be proved.*

Plaintiff claims that this case is governed by general principles of contract law and that a showing of "fraud or gross imposition" is not a prerequisite to recovery.

The American Bar Association first adopted an ethical code in 1908, when the original Canons of Professional Ethics were adopted by the ABA House of Delegates. These Canons began:

> No code or set of rules can be framed, which will particularize all the duties of the lawyer in the varying phases of litigation or in all the relations of professional life. The following canons of ethics are adopted by the American Bar Association as a general guide . . . .

*Canons of Ethics* (American Bar Association 1908). This "general guide" consisted of thirty-two Canons. Canon 14, entitled "Suing a Client for a Fee," read:

> Controversies with clients concerning compensation are to be avoided by the lawyer so far as shall be compatible with his self-respect and with his right to receive reasonable recompense for his services; and lawsuits with clients should be resorted to only to prevent injustice, imposition or fraud.

Unremarkably, the delegates contemplated that lawyers would bring lawsuits to collect fees, and, in a 1943 opinion, the ABA Committee on Professional Ethics and Grievances addressed the issue of fee collection, stating: "Ours is a learned profession, not a mere money-getting trade. . . . Suits to collect fees should be avoided. Only where the circumstances imperatively require, should resort be had to a suit to compel payment." ABA Comm. on Professional Ethics and Grievances, Formal Op. 250 (1943).

In 1964, the House of Delegates created a committee to examine the Canons and to make recommendations for changes. The result of the committee's work was the "Model Code of

---

\* EC 2-23 states:
  A lawyer should be zealous in his efforts to avoid controversies over fees with clients and should attempt to resolve amicably any differences on the subject. He should not sue a client for a fee unless necessary to prevent fraud or gross imposition by the client.

Professional Responsibility" (Code) adopted by the House of Delegates in 1969. The Code became effective for ABA members on January 1, 1970, and was adopted by the Vermont Supreme Court in 1971. Code of Professional Responsibility; see generally *Model Code of Professional Responsibility and Code of Judicial Conduct* (American Bar Association 1980).

■ The Code's format was changed from that of its predecessor. Rather than being divided solely into Canons, it was divided into three parts: Canons, Ethical Considerations, and Disciplinary Rules. The Canons are "general terms" which "embody the general concepts from which the Ethical Considerations and the Disciplinary Rules are derived." *Model Code of Professional Responsibility*, Preliminary Statement. The Canons have corresponding Ethical Considerations, which "are aspirational in character and represent the objectives toward which every member of the profession should strive. They constitute a body of principles upon which the lawyer can rely for guidance in many specific situations." *Id.* Last, there are Disciplinary Rules, which, "unlike the Ethical Considerations, are mandatory in character." *Id.* It is the Disciplinary Rules, therefore, not the Ethical Considerations, that provide the compulsory minimum standard which attorneys must observe.

The Canon pertinent to the present case, Canon 2, states: "A Lawyer Should Assist the Legal Profession in Fulfilling Its Duty to Make Legal Counsel Available," and is followed by a series of corresponding Ethical Considerations. One of these, EC 2-23, is the principal basis for the trial court's decision.

■ We find little in the way of precedent to deny recovery based on violation of EC 2-23. There is no Disciplinary Rule that includes any general prohibition on actions by attorneys to recover legal fees, except Disciplinary Rule 2-106(A) (DR 2-106(A)), which states: "A lawyer shall not enter into an agreement for, charge, or *collect* an illegal or clearly excessive fee." (Emphasis added.) Because DR 2-106(A) contemplates that legal and reasonable fees may be collected, the question is raised—does EC 2-23 turn an otherwise reasonable fee into an illegal fee merely because a lawyer must sue to collect it? We think the question answers itself. The trial court expressly found that the fees due in this case were "necessary and reason-

able" and stated, "The court does not intend to imply in any way that the plaintiff acted in an improper manner in any respect."

The court also found no evidence of fraud by the client, and we agree with the commentator who observed: "It is highly unlikely that an attorney could prove a client acted in a fraudulent manner for not paying a fee." J. Smith, *The Pitfalls of Suing Clients for Fees*, 69 A.B.A.J. 776, 778 (1983). Moreover, whatever the term "gross imposition" may mean, it is too amorphous a standard to be an element of the contract cause of action against a client. *Id.* As the same commentator has pointed out, if EC 2-23 has any teeth at all, it may be that an attorney's suit to recover fees provides "some evidence . . . that the standard of care was breached" should the client bring a malpractice counterclaim. *Id.*

■ Further, we find no indication from the trial court's findings, nor was there any evidence at trial, that plaintiff brought suit in bad faith or for the purpose of harassing defendant, rather than simply to adjudicate a valid dispute between them. Although the filing of a suit to recover fees may not violate any Disciplinary Rule, if a lawyer fails to make even minimal attempts to resolve disputes prior to filing suit and resorts frequently to court action to collect fees, a "serious violation" of the standard set forth in EC 2-23 may be found. *In re Wetzel*, 574 P.2d 826, 828 (Ariz. 1978).

Our conclusion that legal action to collect unpaid attorney's fees is not a per se violation of public policy is consistent with the limited case law on this subject. This precise issue was decided in *Kizer v. Davis*, 369 N.E.2d 439 (Ind. Ct. App. 1977), where that court held that "Ethical Consideration 2-23 was never intended as a rule of law, nor can it be applied as a bar to an otherwise successful action . . . ." *Id.* at 445. Moreover, we agree with the *Kizer* court that "it is in the public interest that attorneys receive fair compensation for their services. Adequate compensation is necessary in order to assure effective representation and to maintain the integrity and independence of the bar." *Id.* (citing *Manatee County v. Harbor Ventures, Inc.*, 305 So. 2d 299, 301 (Fla. Dist. Ct. App. 1974)).

■ Nor does the lack of a *written* fee agreement affect the result. In *Parker, Lamb & Ankuda, P.C. v. Krupinsky*, 146 Vt.

304, 503 A.2d 531 (1985), we held that a written fee agreement is not required to collect payment for legal services, despite the preferred practice to have one. See EC 2-19 ("usually beneficial to reduce to writing the understanding of the parties regarding the fee").

We conclude that a strict prohibition on the collection of fees, such as the one announced by the trial court, would have the unintended effect of undermining rather than strengthening public policy. The plain language of Canon 2 states that the legal profession has a *duty* to make counsel available, and limiting an attorney's ability to collect fees from disgruntled and recalcitrant clients would serve to discourage members of the profession from taking on cases unless payment is made in advance. Furthermore, EC 2-16 recognizes that "[t]he legal profession cannot remain a viable force in fulfilling its role in our society unless its members receive adequate compensation for services rendered, and reasonable fees should be charged in appropriate cases to clients able to pay them." Here, there was no question raised as to whether defendant was unable to pay; he simply refused to do so. Lawyers "should not be left helpless when they render valuable service and confront an alternative of a write-off or a suit." *Heninger & Heninger v. Davenport Bank & Trust Co.*, 341 N.W.2d 43, 51 (Iowa 1983).

In sum, we find no reason to impose a heightened burden of proof on plaintiff based on EC 2-19 (preferable to have written agreement) and EC 2-23 (suit necessary to prevent fraud or gross imposition).

We recognize that while some states have established mandatory procedures for resolution of fee disputes, such as arbitration or mediation, see, e.g., Calif. Bus. & Prof. Code, §§ 6200–6206, Vermont has not. Although we encourage such practices to resolve lawyer-client disputes, the absence of a mandatory alternative dispute resolution process is another reason to apply the traditional standards of contract law in this case.

*Reversed.*