PHIL WATSON, P.C., Appellant,

v.

Gregory W. PETERSON, Todd A. Elverson, Jon A. Vasey, Thomas J. Jackowski, and Elverson, Vasey & Peterson, L.L.P., Appellees.

No. 00–1271.

Supreme Court of Iowa.

Sept. 5, 2002.

Carlton G. Salmons of Gaudineer, Comito & George, L.L.P., West Des Moines, for appellant.

Mark J. Wiedenfeld of Wiedenfeld & McLaughlin, L.L.P., Clive, for appellees.

LARSON, Justice.

Gregory Peterson left the law firm with which he had been associated and joined a new firm. He continued to represent several clients with whom he had been working in his old firm. The firm, Phil Watson, P.C. (Watson), sued Peterson, his new partnership, Elverson, Vasey, and Peterson, L.L.P. (EVP), and the partners individually, on several theories, and the defendants counterclaimed. The district court entered its judgment, and both parties appealed. We modify and affirm on both appeals.

## I. *Facts and Prior Proceedings.*

Peterson was an associate in the Watson firm for twelve years before he resigned on May 1, 1996, to become a partner in EVP. Peterson's employment with Watson was at will, based on an oral agreement that provided Watson would pay Peterson an annual salary, a bonus of a set percentage of his contingency-fee receipts, medical insurance, and other benefits. There was, however, no agreement concerning termination of the employment relationship or how fees would be allocated in the event of termination.

Peterson's practice with Watson was largely a contingent-fee practice in plaintiffs', workers' compensation, and social security cases. Peterson also represented Watson's credit-card-company clients in bankruptcy and collection matters. The clients Peterson represented had signed attorney-client contracts with Peterson and, while Watson did not sign the contracts, the contracts indicated Peterson was associated with the Watson firm. Peterson believed the clients he represented were his, not Watson's, despite his association agreement with Watson providing that the gross fees from contingency-fee cases were Watson's property.

About two months before Peterson resigned, he began contacting some of the clients he had represented, and in some cases obtained on a preprinted form the clients' authority for Peterson to take their cases to EVP. This form stated:

Election

Dear Mr. Peterson: I would like you to continue to represent me. Please take my file(s) with you and continue with the present representation.

_____

Client

Date

In at least one case, Peterson obtained authorization by telephone.

In the weeks prior to his departure, Peterson obtained several of these consents and quietly removed files for those cases from Watson's premises. He took thirty cases, twenty of which later produced fees. Ten were contingent-fee cases. The EVP partners left it to Peterson to decide how much to set aside for a quantum meruit reimbursement to Watson for each case that produced a fee after Peterson left Watson. Peterson segregated for repayment to Watson $130 for each hour he had worked at Watson on a case producing a fee. All of the cases brought from Watson were resolved between 1996 and 1998. From time to time during that period, Peterson calculated his time spent on the case while at the Watson firm and tendered various checks to Watson at the rate of $130 per hour. Watson refused to endorse the checks without knowing the particulars of the fee recovery and an accounting. He also objected to the accord and satisfaction provisions on the endorsement portion of the checks. Peterson and EVP acknowledged that Watson was entitled to a quantum meruit payment, and they retained $40,766 earmarked for Watson on that basis.

The parties apparently agreed at trial on the number, nature, and specifics of the cases Peterson brought from the Watson firm. Peterson stated he had spent a total of 286.2 hours on all cases, regardless of recovery, while at the Watson firm. He spent 426.8 hours on the cases after he began with EVP. The cases produced a total gross income of $280,805.

Watson filed a petition for an accounting and declaratory relief and later amended it to add claims of breach of fiduciary duty, tortious interference with contracts, and conversion. Peterson answered and filed a counterclaim for failure to pay wages and

to make contributions to a profit-sharing plan.

The case was tried to the court, which ruled that, of the $280,805 gross fees in dispute, $114,956 was to be paid to Watson. This was based on a lost-profits theory in which Watson recovered all of the fees minus Peterson's salary, bonus, benefits, and other overhead costs that Watson was able to avoid. The court found Peterson liable for breach of fiduciary duty and interference with a contract, but not for conversion. The court also found that EVP and all of the individual partners were jointly and severally liable for the entire amount on a theory of constructive trust. The court, however, rejected Watson's request for punitive damages and attorney fees. The court awarded Peterson $519.23 for unpaid wages.

On the parties' motions to reconsider, the court confirmed most of its findings against Peterson but reversed its finding of a constructive trust. The court continued to hold EVP and its individual partners jointly and severally liable for damages on a theory of aiding and abetting and partnership liability, although those claims had not been pled by Watson. The court made some adjustments to the judgment concerning interest and Peterson's counterclaim and entered a judgment of $114,436.77 against all defendants jointly and severally. All parties appealed. Our review is de novo.

## II. *Whose Clients Are They?*

When a law firm and an associate have no agreement for posttermination division of fees in cases originally handled by the firm, how shall the fees be determined: should they become the sole property of the firm, the departing lawyer, or both? Further, if the fees are to be divided, on what basis should that be done? The dis-

trict court ruled that the fees collected by Peterson on cases he obtained while associated with the Watson firm remained the property of Watson, subject to payment of salary and benefits to Peterson as if Peterson had continued to work for Watson. For the reasons that follow, we disagree with this analysis.

Watson also contends the procedure used by Peterson in contacting clients and obtaining their consent to remove files before the termination of Peterson's employment was improper. The proper procedure to follow, according to Watson, is set out in a 1982 opinion by the Iowa State Bar Association Committee on Professional Ethics and Conduct. This opinion was addressed to an associate who had left a law firm and was inquiring about how to handle cases in which he wanted to continue representation. The opinion stated:

> The Committee is of the opinion that it is the obligation of the firm to advise clients for whom you were doing work that you have left the firm and that the client can elect to have another lawyer in the firm handle the matter or select other counsel, including you, to complete the work.
>
> The firm should furnish you with an appropriate copy or copies of the notification letter so you will know that the clients have been advised of your departure and their options. If the firm fails to notify the clients within a reasonable time (one week to ten days) the Committee is of the opinion that it would be appropriate for you to advise the clients of the above information. If it is necessary for you to so write, you should furnish an appropriate copy or copies of your letter to the firm.

ISBA Comm. on Prof'l Ethics & Conduct, Formal Op. 82–23 (1982) [hereinafter For-

mal Op. 82–23].[1]

We have no cases directly on point. The principal case relied on by Watson and the district court, *West v. Jayne*, 484 N.W.2d 186 (Iowa 1992), is distinguishable. *West* does not stand for the proposition, as Watson urges, that Peterson is entitled to "only that which [he] would have earned under the employment contract." In *West* Jayne was an associate. The lawyers divided contingency fees one-third to the originating attorney, one-third to the attorney doing the work, and one-third to West for office overhead. *West*, 484 N.W.2d at 188, 190. In *West* the issue was whether one attorney, West, who had been suspended, was entitled to his share of the fees in view of the fact that, generally, suspended lawyers may not collect fees for legal work during the period of suspension. We held that, despite the suspension of West's license, his work that justified his referral portion was completed once he referred the case to Jayne, and the other portion West received was for office overhead. *Id.* at 190. This is not an issue in the present case.

Although no Iowa cases are directly on point, the facts of this case are not uncommon. In fact, it has been observed that "[l]aw firms are under siege." *See* Robert W. Hillman, *Law Firms and Their Partners: The Law and Ethics of Grabbing and Leaving*, 67 Tex. L.Rev. 1, 1 (1988) [hereinafter Hillman]. Because of lateral movement by attorneys between firms, there is "the ever-present threat of [a lawyer] leaving and taking what many regard as the firm's assets—its clients." *Id.* at 4.[2] This phenomenon is referred to as "grabbing and leaving."

"The idea that a partner 'leaves' while others 'stay' tips the analysis toward a view that the partner 'taking' clients is, in effect, looting the firm." *Id.* at 5. *Solicitation* of clients by lawyers has been the subject of several Supreme Court cases. *See, e.g., Shapero v. Kentucky Bar Ass'n,* 486 U.S. 466, 108 S.Ct. 1916, 100 L.Ed.2d 475 (1988) (states may not categorically prohibit attorneys from soliciting clients with truthful letters); *Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 98 S.Ct. 1925, 56 L.Ed.2d 444 (1978) (states may discipline attorneys for in-person solicitation of clients).

> Grabbing, [as opposed to solicitation], typically involves clients for whom the lawyer has previously worked. Although grabbing may present some of the abuses of solicitation, it also may effectuate a client's educated and considered choice of a lawyer. Broad regulation of grabbing through ethical standards targeted at solicitation reflects the assumption that a firm "owns" clients and has a prior claim on their "files." A logical extension of this view is that grabbing by "departing" lawyers should be regulated but that grabbing by firms attempting to "retain" clients does not present the same dangers. In a particular case, the actual relationships between a firm, its lawyers, and its clients may or may not justify the presumption

---

1. We do not approve the procedure outlined in this formal ethics opinion because it implies the firm, which is given the right to first contact clients to advise them of the impending departure of a member, somehow "owns" the clients. For the reasons discussed later, clients do not "belong" to the firm or its individual members; clients are free to choose their own attorney, and a departing lawyer has an equal right to notify clients of an impending change so clients may make an informed choice of lawyers.

2. This law review article deals primarily with partnerships, but as the article notes, some of the problems and remedies are the same for lawyer-associates and their relationships. *See* Hillman, 67 Tex. L.Rev. at 29.

favoring the firm in a battle for clients. When applied generally to all cases, however, treatment of grabbing as solicitation is little more than an uncritical extension of the vocabulary's biases [which labels the departing lawyer as the "grabber."]

Hillman, 67 Tex. L.Rev. at 12 (footnote omitted). However, one judge, obviously disdaining the practice of grabbing and leaving, has stated:

> It is noble and daring to embark on a career of law by cutting the umbilical cord that ties one to an employment contract. But taking the heart and soul of the benefactor is immoral, illegal and repulsive. If they want their own firm, let them get their own clients.

*Adler, Barish, Daniels, Levin & Creskoff v. Epstein,* 252 Pa.Super. 553, 382 A.2d 1226, 1233 (1977) (Spaeth, J., concurring), *rev'd,* 482 Pa. 416, 393 A.2d 1175 (1978) (reinstating decree of the court of common pleas).

While the grabbing of clients and their files raises professional issues, the primary concern, of course, is the best interest of the clients. Thus,

> a policy that effectively restricts in-person communications [between a departing lawyer and clients] is questionable on several grounds. First, disfavoring in-person grabbing communications may deprive the client of the very information he needs to make an intelligent choice of counsel. Second, grabbing is most likely to succeed when the client knows the lawyer well and is satisfied with the quality of her work; in such cases, restricting in-person contacts as improper solicitation does little more than restrain competition among lawyers. Finally, restrictions on grabbing assume a vulnerability and naiveté on the part of clients that may not exist. The sophistication of clients, especially

that of larger institutions, may easily match that of their lawyers, in which case the abuses targeted by the antisolicitation provisions simply do not exist.

Hillman, 67 Tex. L.Rev. at 14–15 (footnotes omitted). While ethics rules regarding solicitation might be invoked in these cases, this raises questions. As Professor Hillman observes:

> A strict application of the Model Code's antisolicitation rules to grabbing gives an advantage to law firms in their battles with grabbing lawyers. Judicial decisions sanctioning grabbing as solicitation under the Model Code assume that firms have a prior "right" to their clients and that regulation of firms' attempts to "retain" clients by fending off grabbing is unnecessary. The application of this double standard also conflicts with other tenets of legal ethics, most particularly the principle of client choice and the ban on restrictive covenants, that provide an edge to grabbing partners. The permissible scope of state regulation of grabbing activities remains an open question, but the increasing acceptance of the more liberal Model Rules may render the issue moot and thereby further sharpen the competition of lawyers for "their" clients.

*Id.* at 15 (footnote omitted).

Peterson acknowledges that Watson is entitled to share the fees he has collected on the cases he brought from Watson. The only question is how much he should pay, and that turns on what theory of recovery we adopt. Is it a lost-profit theory for breach of contract as the district court ruled, or is it a quantum meruit theory as suggested by Peterson? Another issue arising from the manner in which Peterson handled his exit from the firm is whether we should order him to pay punitive damages.

## III. *The Theories of Recovery.*

■ Watson contends it is entitled to recover the fees it would have realized if the clients had not left the firm, less Peterson's salary and expenses the firm would have incurred in earning the fees—a lost-profits theory. The problem with this argument is that, by the time the cases were concluded and the fees were earned, there was no longer an attorney-client relationship between Watson and the clients. The termination of that relationship, of course, was due in large part to Peterson's active encouragement and participation, an issue we will discuss later. Nevertheless, the attorney-client relationship between Watson and these clients terminated when the clients made their election to follow Peterson.

■ The right of a client to terminate the relationship with a lawyer is necessarily implied in the attorney-client relationship, and the right is "absolute." *Fracasse v. Brent,* 6 Cal.3d 784, 100 Cal.Rptr. 385, 494 P.2d 9, 10 (1972). The courts' solicitude toward a client's right to decide who will represent him explains the courts' aversion to restrictive covenants between attorneys. *See Meehan v. Shaughnessy,* 404 Mass. 419, 535 N.E.2d 1255, 1262 (1989) ("The strong public interest in allowing clients to retain counsel of their choice outweighs any professional benefits derived from a restrictive covenant. Thus, the [firm] could not restrict a departing [attorney's] right to remove any clients who freely choose to retain him or her as their legal counsel."). *See also Anderson v. Aspelmeier, Fisch, Power, Warner & Engberg,* 461 N.W.2d 598, 601–02 (Iowa 1990) (discussing rationale for rule prohibiting restrictive covenants between lawyers); *see generally,* Robert W. Hillman, *Professional Partnerships, Competition, and the Evolution of Firm Culture: The Case of Law Firms,* 26 J. Corp. L. 1061 (2001).

■ Attorneys, of course, have the right to be compensated for the value of their services rendered before the termination. When a contingency-fee case is concluded after the termination of the attorney-client relationship, the attorney is entitled to be paid the value of his services under a quantum-meruit theory, but not on the basis of the contract amount. *See Fracasse,* 100 Cal.Rptr. 385, 494 P.2d at 10. The court in *Fracasse* said:

> For the reasons hereinafter stated, we have concluded that this rule [allowing full contingent-fee recovery following termination of attorney-client relationship] is inconsistent with the strong policy, expressed both judicially and legislatively, in favor of the client's absolute right to discharge his attorney at any time, and that the attorney should be limited to a quantum meruit recovery for the reasonable value of his services, upon the occurrence of any contingency contemplated by this contract.

*Id.* (overruling prior California case allowing recovery of full contingent fee); *accord Ecclestone, Moffett & Humphrey, P.C. v. Ogne, Jinks, Alberts & Stuart, P.C.,* 177 Mich.App. 74, 441 N.W.2d 7, 8–9 (1989) (former firm was awarded appropriate portion of attorney fee, earned from case associate took with him when he left the firm, on the basis of quantum meruit); *Baker v. Zikas,* 176 Neb. 290, 125 N.W.2d 715, 717–18 (1964).

> Although a firm normally will prefer to carry a contingent-fee case to completion and receive the contractually based compensation rather than a quantum meruit recovery, the increasing acceptance of compensation based on the value of services rendered prior to discharge accommodates the interests of both the firm and its former client.

This accommodation may well be appropriate in the grabbing context.

Hillman, 67 Tex. L.Rev. at 27 (footnotes omitted).

Watson's lost-profits claim could not prevail, even if it did not involve the unique rules applicable to lawyers. If Peterson were an employee at will in a manufacturing business and was the only employee capable of making a certain product, his employer could not sue him for lost profits that would have been realized for the products that could have been produced if Peterson had remained employed. In the present case, it is really not the *fact* that Peterson left the firm that gives rise to a compensable claim because, as an employee at will, he could do so at any time for any reason. Rather, it is the *manner* in which Peterson left—an issue we address later—that presents the problem.

Watson claims quantum meruit will not satisfy its contract claim for lost profits, which it calculates was $235,964. We conclude quantum meruit is the appropriate measure of recovery for the reasons discussed. Moreover, Watson has not shown that Peterson's failure to comply with ethics opinion 82–23 resulted in its loss of any contingent fees. If Peterson and the Watson firm had followed the recommended procedures of that opinion, the clients would still have been given the option to retain Peterson individually (or as a partner in EVP) and discharge Watson. Watson has not shown that the unilateral notification used by Peterson had any effect on the realignment of clients between the lawyers except, perhaps, to accelerate the process. Acceleration of the process is not shown by Watson to have had any effect on its claim to the contingent fees.

## IV. *Compensatory Damages.*

■ We believe the proper way to calculate the division of the contingency fees is to award Watson a percentage of each fee based on the percentage of time Peterson spent on each case at Watson compared to the time spent on the case at EVP. The percentage of time Peterson spent on a case at Watson ranged from two to 43.4%. Multiplying the percentage of time spent on each case times the amount collected in each contingency-fee case, Watson's share would be $34,240. The noncontingency fees, which were based on an hourly fee, totaled $21,186. Based on the time spent on these cases at Watson, Watson's share would be $16,726. The total share of fees owed to Watson is therefore $50,966. This amount should have been paid by the clients to Watson, and because Peterson is now in possession of those funds, we decree them to be held by Peterson personally in trust for Watson, and we order a judgment to be entered against that fund accordingly.

## V. *Additional Damage Claims.*

■ Watson requested an award of punitive damages, but the district court refused to grant them. We affirm on that issue because, while we strongly disapprove of Peterson's methods of terminating the relationship, particularly his clandestine removal of client files, Watson did not establish by "clear, convincing, and satisfactory" evidence that Peterson's actions toward Watson were motivated by malice. *See Condon Auto Sales & Serv. v. Crick,* 604 N.W.2d 587, 594 (Iowa 1999).

We also reject Watson's claim for additional compensatory damages based on a theory of breach of fiduciary duty. Even if such a breach were established, Watson has failed to show Peterson's method of terminating the relationship had any effect on the ultimate alignment of clients, except to accelerate it. Watson has not established that this accelerated process result-

ed in any separate damages based on a breach of fiduciary duty.

On our de novo review, we find the evidence insufficient to establish liability against Peterson's new firm members on any of the theories asserted. The judgment of the district court is modified to impose judgment against the funds held in constructive trust by Peterson. As so modified, the judgment of the district court is affirmed on the appeal and cross-appeal.

**JUDGMENT MODIFIED AND AFFIRMED; CASE REMANDED FOR ENTRY OF NEW JUDGMENT.**