Pamela J. WALKER, Appellant,

v.

Charles E. GRIBBLE, Appellee,

and

Gribble & Prager, P.C., Intervenor–Appellee.

No. 03–1380.

Supreme Court of Iowa.

Nov. 10, 2004.

Mark D. Sherinian of Sherinian & Walker, P.C., Des Moines, for appellant.

Mark J. Wiedenfeld and Joseph P. McLaughlin of Wiedenfeld & McLaughlin, L.L.P., Des Moines, for appellees.

STREIT, Justice.

Breaking up is hard to do. Eight years after signing a settlement agreement that broke up their law firm, two lawyers are still fighting over how to divide the proceeds from four potentially lucrative cases they took long ago on a contingency-fee basis. In essence, one of the lawyers claims she violated the Iowa Code of Professional Responsibility for Lawyers when she signed the agreement and for this reason asks us to void it so she can recover a larger share of the proceeds. Because we find the agreement does not run afoul of the Code, we decline to interfere with the parties' bargain. Therefore, we affirm the district court's order granting the defendant's motion for summary judgment.

## I. Facts and Prior Proceedings

As viewed in a light most favorable to the plaintiff, Pamela Walker, the facts are as follows:

Pamela Walker (f/k/a Pamela Prager) and Charles Gribble are lawyers in the Des Moines area. In 1994, several individuals asked Gribble if he would represent them in a lawsuit (*Raper*) against the State of Iowa for alleged overtime-pay violations. Walker—who was working for Gribble as an independent contractor—researched the issues, prepared the complaint, and consulted with the plaintiffs. Gribble performed little work on the case.

In the summer of 1994, Whitfield & Eddy, a Des Moines law firm, took in Gribble as a shareholder and Walker as an associate. While at Whitfield & Eddy, Walker continued to work on *Raper*. A plaintiff in another overtime-pay case (*Varnum*) also contacted Walker while at Whitfield & Eddy. Because Walker could not attend the initial consultation she had arranged, Gribble held the first meeting with the clients and signed the fee agree-

ment. Walker performed all subsequent work on *Varnum.*

In 1995, Gribble and Walker left Whitfield & Eddy and formed a partnership in a new firm, Gribble & Prager ("the firm"). Under the terms of their partnership, the two agreed to split their income seventy percent to Gribble and thirty percent to Walker. Whereas Gribble contributed $7000 to the capitalization of the firm, Walker contributed $3000, which she borrowed from Gribble. Gribble also loaned the firm $130,000.

During the time Gribble and Walker were practicing together at the firm, plaintiffs in two other overtime-pay cases (*Phillips* and *Kennedy*) contacted Walker. Although the parties admit the clients in *Raper, Varnum, Phillips,* and *Kennedy* (collectively referred to as "the overtime-pay cases") were clients of the firm, Gribble, the majority shareholder, did little or no work on them.

In early 1996, a disagreement between Gribble and Walker over Gribble's handling of the overtime-pay cases erupted. Walker complained Gribble had not done any work on them and was unwilling to get involved. Walker packed up her belongings, marched out of the firm, and took Gribble's longtime secretary with her.

The parties resolved their disagreements through mediation. Both parties were represented by counsel. During mediation, Gribble insisted he remain involved in the overtime-pay cases; Walker wanted Gribble to submit the matter for client consideration. After meeting with Walker and Gribble, the clients decided they wanted Walker to represent them. *See Phil Watson, P.C. v. Peterson,* 650 N.W.2d 562, 565 n. 1 (Iowa 2002) ("[C]lients do not 'belong' to [a] firm or its individual members; clients are free to choose their own attorney . . . .").

The mediation culminated in a "settlement agreement" signed in July 1996 by Gribble, Walker, and the firm. The agreement resolved a number of hotly contested issues. First and foremost, the parties formally agreed to end their partnership. Gribble forgave a personal loan to Walker in the amount of $1750. The parties promised to stop making derogatory comments about one another and to release and forever discharge each other from all claims they might have against one another.

The parties agreed to split all fees they might earn in the overtime-pay cases as follows: in *Varnum, Phillips,* and *Kennedy,* fees would "be divided proportionately based on the number of hours spent by [the firm], prior to the resignation of [Walker] and the number of hours spent by [Walker] and her associated attorneys after the termination." The parties agreed the firm would receive a minimum of thirty-five percent and a maximum of fifty-five percent of any fee earned after the payment of expenses; Walker would control the remainder. In *Raper,* the parties agreed the firm would receive a fixed forty-five percent of any fee earned; Walker would retain the remaining fifty-five percent. Of the firm's earnings on all the overtime-pay cases, it was further agreed that seventy percent would be given to Gribble and thirty percent to Walker in accordance with their respective shares in the partnership.

Gribble formally withdrew his representation in the overtime-pay cases after the settlement agreement was signed. The Secretary of State administratively dissolved the firm in September 1996.

At the time Walker signed the settlement agreement, she believed little work remained on the overtime-pay cases. She was wrong. Additional plaintiffs and claims were added to all four cases and other issues developed resulting in pro-

tracted litigation, including three appeals to this court. *See Raper v. State,* 688 N.W.2d 29 (Iowa 2004); *Kennedy v. State,* 688 N.W.2d 473 (Iowa 2004); *Anthony v. State,* 632 N.W.2d 897 (Iowa 2001), *cert. denied,* 534 U.S. 1129, 122 S.Ct. 1068, 151 L.Ed.2d 971 (2002).[1] (For example, Walker claims she worked over 3000 hours on *Raper*—2500 after she physically left the firm—whereas Gribble worked only eleven hours.) The parties subsequently agreed the firm should only receive the minimum percentage (thirty-five percent) under their agreement in *Varnum, Phillips,* and *Kennedy.*

*Varnum* and *Phillips* settled, and a substantial amount of attorney fees were earned. Pursuant to the terms of the settlement agreement, Walker received sixty-five percent of the total after expenses; the remaining amount was placed in escrow pending the outcome of this appeal. If the terms of the settlement agreement are enforced, Gribble will receive seventy percent of the remaining thirty-five percent; Walker will take the rest. The precise amount of attorney fees in *Kennedy* and *Raper* is not yet known.

Walker filed a petition for a declaratory ruling in the district court asking the court to void the terms of the deal. Walker claimed the parties' contract was unenforceable because it ran afoul of two provisions of the Iowa Code of Professional Responsibility for Lawyers.

Gribble counterclaimed. Gribble asked the court to declare the agreement valid and enforceable. The firm intervened on Gribble's behalf and counterclaimed. The district court granted the counterclaimants' motion for summary judgment, and Walker appealed.

## II. Standard of Review

Our review of a grant of a motion for summary judgment is for the correction of errors at law. *Delaney v. Int'l Union UAW Local No. 94,* 675 N.W.2d 832, 834 (Iowa 2004). Summary judgment is appropriate only if the record shows no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Iowa R. Civ. P. 1.981(3); *see, e.g., Lloyd v. Drake Univ.,* 686 N.W.2d 225, 228 (Iowa 2004); *Coralville Hotel Assocs., L.C. v. City of Coralville,* 684 N.W.2d 245, 247 (Iowa 2004). A factual issue is material when "the dispute is over facts that might affect the outcome of the suit, given the applicable law." *Fouts ex rel. Jensen v. Mason,* 592 N.W.2d 33, 35 (Iowa 1999) (citation omitted).

The moving party bears the burden of showing the nonexistence of an issue of fact, and when determining whether such an issue exists we view the record in a light most favorable to the nonmoving party. *Estate of Harris v. Papa John's Pizza,* 679 N.W.2d 673, 677 (Iowa 2004); *Coralville Hotel Assocs.,* 684 N.W.2d at 247. In other words, we will indulge in every legitimate inference that the evidence will bear in an effort to ascertain the existence of a fact question. *Lloyd,* 686 N.W.2d at 228. A fact question is generated if reasonable minds can differ on how the issue should be resolved. *See McIlravy v. N.*

---

**1.** At times, Walker blames her troubles on an unexpected United States Supreme Court decision, *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). The overtime-pay cases were originally filed in federal court, but *Seminole Tribe* divested the federal courts of jurisdiction and required Walker to refile them in state court.

*See Raper v. Iowa,* 940 F.Supp. 1421 (S.D.Iowa 1996), *aff'd,* 115 F.3d 623 (8th Cir. 1997). Although it is true *Seminole Tribe* was handed down after the mediation meeting, the parties did not sign the settlement agreement until after the cases were refiled in Iowa district court.

*River Ins. Co.,* 653 N.W.2d 323, 328 (Iowa 2002).

### III. The Merits: The Validity of the Settlement Agreement

██ As indicated, Walker's primary complaint is that the district court erred in not finding the settlement agreement void insofar as it allegedly ran afoul of the Iowa Code of Professional Responsibility for Lawyers.

██ In *Wright v. Scott,* we expounded upon the wisdom, nature, and guiding principles of settlement agreements:

> The law favors settlement of controversies. A settlement agreement is essentially contractual in nature. The typical settlement resolves uncertain claims and defenses, and the settlement obviates the necessity of further legal proceedings between the settling parties. We have long held that voluntary settlements of legal disputes should be encouraged, with the terms of settlements not inordinately scrutinized.

410 N.W.2d 247, 249–50 (Iowa 1987) (citations omitted); *see also Shirley v. Pothast,* 508 N.W.2d 712, 715 (Iowa 1993). In contingency-fee cases, settlement agreements generally benefit clients, insofar as they "simply seek[] to obviate time-consuming squabbles that formerly arose when [a lawyer's] entitlement to [a] fair share of any fee generated by a departing client's file was determined on a quantum meruit basis." *McCroskey, Feldman, Cochrane & Brock, P.C. v. Waters,* 197 Mich.App. 282, 494 N.W.2d 826, 828 (1992); *accord Phil Watson,* 650 N.W.2d at 567–68 (adopting quantum-meruit theory to resolve squabble between departing associate and firm over contingency-fee cases associate "grabbed" from firm). We enforce a settlement agreement much like any other contract. *See Phipps v. Winneshiek County,* 593 N.W.2d 143, 146 (Iowa 1999) ("[L]ike a contract, we enforce a settlement agreement absent fraud, misrepresentation, or concealment.").

### A. Unfair Bargain

Against this backdrop, we may readily dismiss a running theme in Walker's argument: namely, her complaint the settlement agreement she signed eight years ago is unfair because she ended up working more than she anticipated when she signed it. The district court concisely and correctly dismissed this argument when it found:

> [W]hen these parties were negotiating, neither of them could know with any certainty how much time would be required to resolve the cases. The [settlement a]greement provides that the fees are to be divided based on a ratio of time spent before the split to total time spent. The parties also negotiated a range of percentages, obviously intended to protect both parties by providing some maximum and minimum division. In negotiating these provisions, the parties certainly brought to the bargaining table their best guesses about the cases and what would be required to resolve them. Both parties accepted the risk inherent in contingent fee cases that no fees would be payable. Both assumed the proportional division with protective maximum and minimum percentages would guard against an unfair result. *The fact that one [(or both)] of the parties was wrong does not provide a basis for overturning a settlement agreement that was entered into as a result of arms-length negotiations by parties who are not only attorneys themselves but who were both also represented throughout the negotiations by other attorneys.... Walker must live with the bargain she freely entered into.*

.... Walker wants now to renegotiate the [a]greement. This court will not entertain that effort. She made a bargain. Even if it was a bad bargain, under general principles of contract law, she lives with that bargain.

(Emphasis added.) We agree with this assessment. Uncertainty is a powerful incentive for parties to accept a compromise settlement agreement. *See Wright,* 410 N.W.2d at 249. Much was uncertain when the parties signed the settlement agreement; such is the very nature of cases taken on a contingency-fee basis. The parties in this case assessed the situation and made their choices regarding the time and effort Walker would have to expend in the future to bring the overtime-pay cases to a successful resolution. They also gave up other claims against each other and each received some benefits. We will not interfere with their agreement—fully performed with the exception of the payment of the fees—simply because one party got the better end of the bargain. "It is ... well settled that to vitiate a settlement, *a mistake must be* mutual, material, and *concerned with a present or past fact.*" *Id.* (emphasis added, internal quotation omitted).

■■■ Parties to contracts should not look to courts to rescue them from their bad bargains. *Smith v. Harrison,* 325 N.W.2d 92, 94 (Iowa 1982).

Courts should ... support agreements which have for their object the amicable settlement of doubtful rights by parties.... [S]uch agreements are binding without regard to which party gets the best of the bargain or whether all the gain is in fact on one side and all the sacrifice on the other.

*Id.* (internal quotation omitted). "The courts can have no concern with the wisdom or folly of ... a contract." *Bjornstad v. Fish,* 249 Iowa 269, 279, 87 N.W.2d 1, 7 (1957) (citations omitted). To the extent Walker's claim should be understood as a complaint she received a bad bargain, we decline to void the contract as requested.

## B. Public Policy

■■■ Walker more pointedly argues the settlement agreement she signed should not be enforced because it violates public policy. Specifically, Walker complains the agreement contravenes two provisions of the Iowa Code of Professional Responsibility for Lawyers, thus providing her an "equitable defense" against enforcement of its terms. (It is not clear, however, whether Walker seeks rescission of the entire contract or just nonenforcement of the fee-splitting clauses.) In support of her argument, Walker cites two cases in which we have refused to enforce a contract because it ran afoul of the Code and therefore violated public policy. *See, e.g., Rogers v. Webb,* 558 N.W.2d 155, 157 (Iowa 1997) (contingency fee contract in divorce violated public policy of preserving the marital relationship); *Wunschel Law Firm, P.C. v. Clabaugh,* 291 N.W.2d 331, 335 (Iowa 1980) (contingency fee for defense of defamation action violated public policy). Here, Walker claims the settlement agreement she signed violates (1) DR 2–107, insofar as it purports to divide fees between lawyers who are not in the same firm without client consent and in a fashion not proportional to the services performed and the responsibility assumed by each; and (2) DR 2–106, because enforcement of the agreement, she alleges, would allow Gribble to collect a "clearly excessive fee" in light of the work he performed on the project.

■■■ It is true that "contracts that contravene public policy will not be enforced." *Rogers,* 558 N.W.2d at 156–57; *see Walker v. Am. Family Mut. Ins. Co.,* 340 N.W.2d 599, 601 (Iowa 1983); *Wun-*

*schel,* 291 N.W.2d at 335. "[A] court ought not enforce a contract which tends to be injurious to the public or contrary to the public good." *Rogers,* 558 N.W.2d at 157 (citation omitted). Nonetheless, we proceed cautiously and will invalidate a contract on public policy grounds "only in cases free from doubt." *DeVetter v. Principal Mut. Life Ins. Co.,* 516 N.W.2d 792, 794 (Iowa 1994). Walker bears the burden of proof. *Cogley Clinic v. Martini,* 253 Iowa 541, 550, 112 N.W.2d 678, 682 (1962); *Richmond v. Dubuque & Sioux City R.R.,* 26 Iowa 191, 202 (1868); *see Hartford Fire Ins. Co. v. Chicago, Milwaukee & St. Paul Ry.,* 62 F. 904, 908 (C.C.N.D.Iowa 1894), *aff'd,* 70 F. 201 (8th Cir.1895), *aff'd,* 175 U.S. 91, 20 S.Ct. 33, 44 L.Ed. 84 (1899). Before striking down a contract for public policy reasons, it must be shown that preservation of the general public welfare outweighs the weighty societal interest in the freedom of contract. *Rogers,* 558 N.W.2d at 158; *see Bergantzel v. Mlynarik,* 619 N.W.2d 309, 317 (Iowa 2000) (quoting Restatement (Second) of Contracts § 178(2)-(3), at 6–7 (1981) (setting forth factors for and against enforcement)).

### 1. DR 2–107

As indicated, Walker claims the settlement agreement offends public policy because it violates DR 2–107 and DR 2–106 of the Iowa Code of Professional Responsibility for Lawyers. The first of these two disciplinary rules provides as follows:

(A) A lawyer shall not divide a fee for legal services with another lawyer who is not a partner in or associate of the lawyer's law firm or law office, unless:

(1) The client consents to employment of the other lawyer after a full disclosure that a division of fees will be made.

(2) The division is made in proportion to the services performed and responsibility assumed by each.

(3) The total fee of the lawyers does not clearly exceed reasonable compensation for all legal services they rendered the client.

(B) This disciplinary rule does not prohibit payment to a former partner or associate pursuant to a separation or retirement agreement.

Iowa Code of Prof'l Responsibility DR 2–107.[2] The primary purpose of DR 2–107 is to guard against referral fees (sometimes called "brokering"), a practice other courts have long declared injurious to the public interest. *See, e.g., Tomar, Seliger, Simonoff, Adourian & O'Brien, P.C. v. Snyder,* 601 A.2d 1056, 1058 (Del.Super.Ct.1990) ("DR 2–107 . . . was formulated to prohibit brokering, to protect a client from clandestine payment and employment, and to prevent aggrandizement of fees." (internal quotation omitted)); *McCroskey,* 494 N.W.2d at 828 (same); *cf. Norton Frickey, P.C. v. James B. Turner, P.C.,* 94 P.3d

---

**2.** The American Bar Association's Model Rules of Professional Conduct contain a provision that is similar to DR 2–107. The corresponding rule reads as follows:

A division of a fee between lawyers who are not in the same firm may be made only if:
(1) the division is in proportion to the services performed by each lawyer or each lawyer assumes joint responsibility for the representation;

(2) the client agrees to the arrangement, including the share each lawyer will receive, and the agreement is confirmed in writing; and
(3) the total fee is reasonable.
Model Rules of Prof'l Conduct R. 1.5(e) (2003); *see also id.* R. 1.5(e) cmt. 8 ("Paragraph (e) does not prohibit or regulate division of fees to be received in the future for work done when lawyers were previously associated in a law firm.").

1266, 1268 (Colo.Ct.App.2004). Clients are not chattels to be bought and sold. *See Phil Watson,* 650 N.W.2d at 565 n. 1 (clients cannot be "owned").

Walker's argument is twofold. First, she claims the agreement she signed contravenes DR 2–107(A) because it divides fees without client consent and in a fashion not in proportion to the amount of work each did. She points out that at the time the agreement was reached, she had physically left the firm, and therefore she was no longer Gribble's partner. Second, Walker claims the exception of DR 2–107(B) for separation agreements does not apply. Walker characterizes the settlement agreement between Walker and Gribble as a referral fee, not a separation agreement. Walker argues the agreement she signed is "in essence" a referral fee because when the bargain is viewed in hindsight it rewards Gribble heavily for simply bringing the overtime-pay cases into the firm. In support of this latter argument, Walker points out the agreement was tied to specific cases and "future fees"[3] and Gribble had virtually no involvement in *Kennedy, Phillips,* and *Varnum.*

However, DR 2–107(A) does *not* apply because Walker and Gribble were members of the same firm at the time the agreement was signed for the purposes of the rule. The parties' settlement agreement is plainly a separation agreement and hence falls under DR 2–107(B).

In a nearly identical case, the Texas Court of Appeals came to precisely the same conclusion. In *Baron v. Mullinax,*

*Wells, Mauzy & Baab, Inc.,* a law firm filed suit for a declaratory judgment that its written agreement with a former associate concerning the division of legal fees was valid and enforceable. 623 S.W.2d 457, 459 (Tex.App.1981). While a member of the firm, the former associate had worked on several lucrative asbestos cases. *Id.* Two weeks after he physically left the firm, the former associate and the firm signed a settlement agreement that allowed the former associate to retain responsibility for the cases and divided the fees and costs two thirds to the associate and one third to the firm. *Id.* at 460.

Later on, the former associate claimed the agreement was invalid as a matter of public policy because it violated DR 2–107 as a "contingent fee referral agreement" arranged without client consent. *See id.* The former associate unilaterally decided to continue to handle the cases but not to divide the fees as agreed. *Id.*

The Texas court readily disposed of the former associate's claim. The court wrote:

This agreement does not violate any law, public policy, or the policy of Disciplinary Rule 2–107. At the outset the fee would be a division between a firm and its associate, and later would ripen into a payment to a former associate pursuant to the agreement reached on his separation.

. . . . Since this agreement was between a law firm and an associate of the firm *during the overall process of his separation from that firm,* there is no requirement that the clients either be informed

---

**3.** Walker takes issue with a sentence in the district court opinion that rejected her argument that the fees were "future fees." She characterizes this as an issue of fact wrongly decided in Gribble's favor. We agree summary judgment should be granted only if there is no genuine issue as to any material

fact and those factual issues must be resolved in Walker's favor where possible because she is the nonmoving party. Contrary to Walker's argument, however, how to best characterize these fees is not a factual matter for determination by a jury.

or give their consent. The clients are in no manner affected by this agreement. Disciplinary Rule 2–107 should not be too readily construed as a license for attorneys to break a promise, go back on their word, or decline to fulfill an obligation, in the name of legal ethics.

*Id.* at 461–62[4] (emphasis added). Other courts concur. *See, e.g., Norton Frickey*, 94 P.3d at 1269–70; *see also Tomar*, 601 A.2d at 1059 (rule "has no application ... [because] there is obviously no issue with regard to the brokering of legal services, the activity which the rule seeks to prevent"); *Romanek v. Connelly*, 324 Ill. App.3d 393, 257 Ill.Dec. 436, 753 N.E.2d 1062, 1070–71 (2001) (same); *Saltzberg v. Fishman*, 123 Ill.App.3d 447, 78 Ill.Dec. 782, 462 N.E.2d 901, 907 (1984) (same); *McCroskey*, 494 N.W.2d at 828; *cf. Hendler & Murray v. Lambert*, 147 A.D.2d 444, 537 N.Y.S.2d 560, 563 (1989) (nothing in DR 2–107 prohibited firm from paying former partner, pursuant to partnership agreement, from cases that arose after the former partner's departure from firm, even though former partner had done no work on case; plain language of DR 2–107(B) exempted such payments). "[L]aw firm members ... may distribute fees among members of a dissolved firm for postdissolution work arising from matters entrusted to the firm before its dissolution." Restatement (Third) of the Law

4. We share the Texas court's concern about the propriety of a lawyer using the ethics rules as a tool to undo the lawyer's own bad bargain. For in alleging the settlement agreement violates the Code, Walker admits she has committed an ethical violation in signing it. *Cf. Cont'l & Comm. Trust & Sav. Bank v. Muscatine, Burlington & S. R.R.*, 202 Iowa 579, 584, 210 N.W. 787, 789 (1926) ("But if he calls upon a court of chancery to put forth its extraordinary powers and grant him purely equitable relief, he may with propriety be required to submit to the operation of a rule which always applies in such cases, and do equity in order to get equity." (Citation omitted.)).

More troublingly, Walker offers a theoretical threat that if we do not rule in her favor she may not be inclined to zealously represent her clients' best interests. This argument is factually suspect and ethically dangerous. Contrary to Walker's assertions, she still has powerful incentive to do her best for the client. She is, after all, still receiving a large percentage of the fee. And anything less than zealous representation *would* violate the ethics rules. *See* Iowa Code of Prof'l Responsibility EC 5–1.

The "Preamble and Scope" to the ABA Model Rules is instructive with respect to Walker's arguments:

Violation of a Rule should not itself give rise to a cause of action against a lawyer nor should it create any presumption in such a case that a legal duty has been breached.... The Rules are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies. They are not designed to be a basis for civil liability. *Furthermore, the purpose of the Rules can be subverted when they are invoked by opposing parties as procedural weapons.*

(Emphasis added.) *Cf.* Iowa Code of Prof'l Responsibility at Preliminary Statement ("The Code ... [does not] undertake to define standards for civil liability of lawyers for professional conduct."); *Brody v. Ruby*, 267 N.W.2d 902, 907–08 (Iowa 1978) (violation of ethics rule did not create cause of action for negligence). Other courts have expressed similar skepticism. *See, e.g., Freeman v. Mayer*, 95 F.3d 569, 574–76 (7th Cir.1996); *Norton Frickey*, 94 P.3d at 1270; *Potter v. Peirce*, 688 A.2d 894, 895–97 (Del.1997); *Benjamin v. Koeppel*, 85 N.Y.2d 549, 626 N.Y.S.2d 982, 650 N.E.2d 829, 831 (1995) ("[C]ourts are especially skeptical of efforts by clients or customers to use public policy as a sword for personal gain rather than a shield for the public good."); *Davies v. Grauer*, 291 Ill.App.3d 863, 225 Ill.Dec. 933, 684 N.E.2d 924, 930 (1997) (recognizing one party "cannot invoke Disciplinary Rule 2–107 as a shield against living up to an allegedly substantively unobjectionable contract arrangement"). We are constrained to pass on these potential issues, however, because we find the settlement

Governing Lawyers § 47 cmt. g, at 334–35 (2000).

The agreement between Walker and Gribble simply divided up firm assets; as indicated, both parties admit the overtime-pay fees were property of the firm.[5] Because the agreement was signed during the overall process of Walker's separation from the firm, there is nothing unethical about the parties' agreement. The agreement does not violate DR 2–107.

Walker characterizes the settlement agreement as a referral fee. The agreement at issue is clearly a separation agreement and not a referral fee. The history of the cases bears out this proposition. Initially, the plaintiffs in *Raper* contacted Gribble. At that time, Gribble was a sole practitioner and Walker was working for him on a contract basis. When *Raper* and *Varnum* were filed, Gribble was a partner and Walker an associate at Whitfield & Eddy. Likewise, Gribble and Walker were partners in Gribble & Prager when the *Phillips* and *Kennedy* cases were filed. At no time did Gribble "refer" the overtime-pay cases to Walker in the sense contemplated by the rule. There was no "brokering" because neither Gribble nor Gribble & Prager ever referred the cases to Walker. Walker worked on them first at Gribble's office as an independent contractor, later as an associate at Whitfield & Eddy, and lastly as a junior partner at the firm. Gribble may have *assigned* the overtime-pay cases to Walker as her supervisor, but he did not *refer* them as articulated in DR 2–107. The cases cited by Walker are inapposite for this very reason; all dealt with referral fees, which are plainly barred by the rule. As Walker's counsel admitted at oral argument, they involve situations where the attorneys did not practice together. *See, e.g., In re P & E Boat Rentals, Inc.,* 928 F.2d 662,

664–65 (5th Cir.1991); *In re Estate of Katchatag,* 907 P.2d 458, 463 (Alaska 1995); *Christensen v. Eggen,* 577 N.W.2d 221, 224–25 (Minn.1998); *Londoff v. Vuylsteke,* 996 S.W.2d 553, 557–58 (Mo.Ct.App.1999); *Ford v. Albany Med. Ctr.,* 283 A.D.2d 843, 724 N.Y.S.2d 795, 797–98 (2001); *see also Corti v. Fleisher,* 93 Ill.App.3d 517, 49 Ill.Dec. 74, 417 N.E.2d 764, 774 (1981).

The fact that Walker did the majority of the work on the overtime-pay cases before she left the firm is not surprising but does not violate public policy. As her employer, supervising partner, or majority shareholder, Gribble had Walker do the bulk of the work on the claims. It is hardly uncommon and certainly not unethical for senior partners to bring in clients only to then turn the cases over to junior partners or associates to handle much of the work, even though the senior partner retains much of the fee. *See, e.g., West v. Jayne,* 484 N.W.2d 186, 190 (Iowa 1992) ("It is a common practice . . . to afford the attorney who secures business . . . a percentage of the eventual fee, regardless of whether that attorney performed the legal services or whether other members of the association completed the work"; "the attorney securing the client . . . is entitled to a percentage of the eventual fee at the time he turns the client's work over to another member of the association."); *Heninger & Heninger, P.C. v. Davenport Bank & Trust Co.,* 341 N.W.2d 43, 48–49 (Iowa 1983) ("substantial inefficiency" to the client results when "senior partner's time [is used] to perform functions that could be done at about half the cost by use of other attorneys in the firm"). Nor does our ethics code prohibit one partner from dividing a fee with another partner or an

---

agreement plainly does not offend the ethics rules.

**5.** This is not to say the *clients* were property of the firm. *See Phil Watson,* 650 N.W.2d at

565 n. 1. When Walker physically left the firm, the clients were free to decide whether they wanted Walker, Gribble, or any other lawyer to represent them in the future. *See id.*

associate. *Heninger*, 341 N.W.2d at 48–49. The division of a fee within a firm is plainly an ethical practice and does not violate public policy. *See id.*

As indicated, DR 2–107 protects against referral fees or "brokering." *See, e.g., Tomar*, 601 A.2d at 1058 (citation omitted); *McCroskey*, 494 N.W.2d at 828. A separation agreement, on the other hand, only seeks to divide a fee the client has already agreed to pay. For this reason, DR 2–107

> most commonly applies in disputes concerning the apportionment of a contingent fee between attorneys who *separately* represented the same client at different stages of a matter. Courts addressing those fee disputes require attorneys to abide by that [rule], and when they do not, courts have held that the fee agreement is void as contrary to public policy and unenforceable.
>
> However, courts addressing an agreement to apportion fees *upon the departure* of an attorney from a law firm have concluded that such agreements are not subject to [the rule], and therefore such agreements are not void and unenforceable.

*Norton Frickey*, 94 P.3d at 1268 (emphasis added, citations omitted); *see also Tomar*, 601 A.2d at 1059 ("It is not uncommon for a law firm and a departing attorney to divide the fees resulting from contingent fee cases which the attorney has been handling and will continue to handle after he leaves.").

DR 2–107 was not designed as a tool to upend settlement agreements once the terms of those agreements become unpalatable to one side. Indeed, were we to rule otherwise many settlement agreements between lawyers and their former firms would be invalid. Such a ruling would also encourage attorneys to leave firms when they receive lucrative contingency-fee cases. It would embolden associates to bolt their firms and claim that simply because they performed more hours of work on cases assigned to them by senior partners they should receive the bulk of the firm's proceeds from those cases. *Cf. Barna, Guzy & Steffen, Ltd. v. Beens*, 541 N.W.2d 354, 356 (Minn.Ct.App. 1995); *Groen, Laveson, Goldberg & Rubenstone v. Kancher*, 362 N.J.Super. 350, 827 A.2d 1163, 1170–71 (Ct.App.Div.2003).

To conclude, we find the parties' settlement agreement does not contravene DR 2–107. For the purposes of DR 2–107(A), Walker and Gribble were members of the same firm when the agreement was signed because it was signed during the overall process of Walker's separation from that firm. *Baron*, 623 S.W.2d at 461–62. The plain text of DR 2–107(B) permits the division of fees without client consent and strict proportionality when the division occurs between partners or is a part of a separation agreement. We affirm the district court.[6]

## 2. DR 2–106

■ Walker also claims DR 2–106 voids the settlement agreement because it results in a clearly excessive fee to Gribble

---

**6.** Walker also claims the agreement does not fall within the ambit of DR 2–107(B) because the agreement cannot authorize a "payment." Walker refers to the fees which are the subject of the agreement as "future fees" that cannot be "paid" because they did not exist at the time the agreement was signed. We do not find this argument persuasive. Nothing in DR 2–107(B) indicates that it only applies to fees previously earned and not fees to be earned in the future. (Comment 8 to Model Rule 1.5(e) expressly contemplates so-called future fees.) Even accepting this characterization of a contingency fee, Walker's argument must fail because it wrongly assumes that the "payment" authorized by DR 2–107(B) must take place at the time the agreement is signed. The rule contains no such constraint.

given the amount of work he has expended on the cases. DR 2–106 provides:

A lawyer shall not enter into an agreement for, charge, or collect an illegal or clearly excessive fee.

DR 2–106(A); *cf.* Model Rules of Prof'l Conduct R. 1.5(a)(2003). The district court ruled the parties' agreement did not contravene the rule. The court held DR 2–106 did not apply to disputes between lawyers regarding the division of a fee. Rather, the court pointed out that the purpose of the rule is to ensure that *clients* do not pay more than they should; so long as the total fee is reasonable, the court reasoned, the rule does not regulate how the lawyers may then divide that fee.

We agree with the district court. The purpose of the rule is to ensure that the client is not charged an excessive fee. If the total fee is reasonable, a lawyer may not use such a rule to upend a settlement agreement that later became a bad bargain. *Cf. Joye v. Heuer,* 813 F.Supp. 1171, 1174 (D.S.C.1993) (finding a related disciplinary rule did not apply to disputes amongst attorneys). Walker does not claim the entire fee charged to the client is excessive, just that the proportion of that fee given to Gribble would be excessive vis-à-vis his work on the project. (This analysis, however, ignores the fact that there was other consideration in the agreement.) The policy of the rule is to prevent attorneys from charging their clients excessive fees, not to guard against one attorney entering into a bad separation agreement that prevents her from getting her "fair share." The agreement does not violate DR 2–106.

### IV.  Conclusion

Nothing in the parties' settlement agreement runs afoul of the Iowa Code of Professional Responsibility for Lawyers. It does not violate public policy. It is en-

forceable. Summary judgment in favor of Gribble and the firm was proper.

**AFFIRMED.**